[Civ. No. 13990.   Second Dist., Div. Three.   Nov. 23, 1943.]

MARY AGNES EMERY et al., Appellants, v. LOS ANGELES RAILWAY CORPORATION (a Corporation) et al., Respondents.

Hurt & Hurt, Arch R. Tuthill and Montague S. Ross for Appellants.

Gibson, Dunn & Crutcher, Philip C. Sterry and E. H. Chapman for Respondents.

SHAW, J. pro tem.—Plaintiffs appeal from a jugment for defendants in an action brought to recover damages for the death of Walter W. Emery, and from an order denying their motion for a new trial. The latter appeal must be dismissed, since such an order is not appealable. Plaintiffs are the widow and children of Walter W. Emery and the defendants are respectively the owner and the driver of a motor coach with which he collided on March 25, 1941. The injuries received by him in this accident caused his death. The case was tried by a jury, which returned a verdict in favor of

defendants. The witnesses called this motor coach a "bus" and we shall do likewise in our statement of facts.

Plaintiffs' points are that the evidence is insufficient to justify a finding either that the defendants were not negligent or that the deceased was guilty of contributory negligence, and that the trial court erred in refusing certain instructions requested by plaintiffs.

The accident in question occurred at about 12:30 a. m., at the intersection of Third Street and Beaudry Avenue, in the city of Los Angeles. Third Street runs east and west and at this point descends in a seven per cent grade from the west to Beaudry Avenue. Beaudry Avenue runs north and south and descends to the north from Third Street in a grade approximately the same as that of Third Street. The angle between Third Street on the west and Beaudry Avenue on the north is, however, slightly greater than a right angle. Each street has a roadway 56 feet wide. The Los Angeles Railway bus, driven by defendant Morris, came down Third Street from the west and made a left turn north into Beaudry Avenue, striking Emery at a point in line with the Third Street sidewalk and five feet west of the center line of Beaudry Avenue. The deceased, Emery, came up Third Street from the east, accompanied by the witness Vance. They walked on the northerly sidewalk of Third Street, stopping at the east curb of Beaudry Avenue as the bus was approaching Beaudry Avenue. As the bus neared Beaudry Avenue its speed, according to the testimony of its driver, Morris, was 20 miles per hour, and it made the left turn at that speed, but he applied the brakes 50 feet before reaching the center of the intersection. At this time no other vehicles and no other pedestrians were in the vicinity.

The jury could readily have inferred that in making the left turn the bus driver "cut the corner"; indeed, any other inference from the evidence would have been rather strained. There were no markers, buttons or signs at the intersection to control or direct the manner of making a left turn. Two police officers who arrived at the scene shortly after the accident testified that they saw a skidmark from 45 to 50 feet long extending back from the left rear wheel of the bus where it had stopped after the accident. They disagreed slightly as to the location of this skidmark, but each placed it so far to the left of the center of the intersection as to indicate that the whole bus must have passed to the left. The witness Vance testified that the bus passed even farther to the left of the center than the officers' testimony

would place it. The bus driver, when asked, "Is it your recollection that you swung around the center?" answered, "No, I don't think I got plumb clear around. I might have got around, like that." If "that" refers to the mark which he immediately thereafter made on a diagram, it indicates that the bus *"might have"* gone to the right of the center, but on a curve which was very sharp for so long a vehicle. This is rather unsubstantial evidence to support a finding that it *did* go there.

The inference from this testimony that in making the left turn the bus did not pass to the right of the center of the intersection, there being no markers, buttons or signs directing otherwise, shows a violation by defendants of section 540, subdivision (b) of the Vehicle Code. An act in violation of such a statute is negligence *per se* (*Gallichotte* v. *California Mut. etc. Assn.* (1935), 4 Cal.App.2d 503, 505 [41 P.2d 349]; *Benjamin* v. *Noonan* (1929), 207 Cal. 279, 283 [277 P. 1045]), unless prudence and safety of life or limb require the doing of the act, so that it is under the circumstances justifiable or excusable (*Umemoto* v. *McDonald* (1936), 6 Cal.2d 587, 590 [58 P.2d 1274]). It appears from the testimony of three witnesses that when the bus stopped it was almost entirely to the left of the center line of Beaudry Avenue; the driver testified that only the left front corner of it was so situated. The driver presented what the jury may have regarded as a sufficient excuse for the manner of turning and the position in which the bus was found by testifying that he saw Emery "after my lights picked him up as I started to turn," that Emery was then three or four feet from the curb, headed west, that "he started walking, a real fast walk, across the street" and "I started clamping my wheels to the left in order to head him off, thinking he would see me in time to stop." Morris also said he then slammed on his brakes. Whether the jury accepted this version, we do not know, but in view of the weight of the evidence against the driver's testimony as to the course of the bus in making the turn, it seems more likely that their verdict was based on a finding of contributory negligence of Emery.

On this issue the evidence was as follows. Vance testified that when he and Emery arrived at the northeast corner of Third Street and Beaudry Avenue they stood on the curb and he looked north and south, and as he looked south, Emery stepped a few feet off the curb, that at this time he saw the bus about opposite the second lamp post from the southwest

corner, on the car track to its right of the center line, and that Emery was then three or four feet into the street. When Vance again looked at the bus it was about opposite a traffic signal at the southwest corner and just starting to make its turn, and Emery was about five feet farther into the street than before. When Vance looked back from this view of the bus Emery was within two or three feet of the center line of Beaudry Avenue. Emery was going west across Beaudry on a line with the sidewalk on Third Street—in other words, he was in what is designated in the Vehicle Code, section 85, as a crosswalk and was in a proper place for him to cross the street and entitled to the right of way over the bus. (Veh. Code, sec. 560.) Vance further testified that as Emery crossed Beaudry Avenue he was going at a slow trot, which he began after two steps into the street and continued until the point of impact and that this point was on the west side of Beaudry. Vance showed this point of impact to the officers later and they marked it with chalk. One of the officers testified that this point was five feet west of the center line of Beaudry Avenue. Vance further testified that Emery did not turn his head in either direction while crossing the street, and that the bus was about 10 or 12 feet from him when he trotted in front of it. When Emery was across the center line and in front of the bus, Vance "hollered, 'look out' " but Emery did not turn his head or indicate in any way that he heard. Morris, the bus driver, testified that when he first saw Emery, as the bus started to turn, Emery was three or four feet out from the curb, headed west, and started walking a real fast walk, "awful fast" across the street and never looked one way or the other, did not turn his head in Morris' direction. Vance and Morris agree that the headlights and all the other lights of the bus were burning and that the front end of the bus struck Emery.

The evidence for defendant further showed that in connection with the autopsy conducted on Emery's body an analysis of his blood was made from which it appeared that the blood contained .19 of one per cent of alcohol. The autopsy physician testified that "that is considered to be a state of acute intoxication during life" and that the amount of alcohol at the time of the analysis would be the same as when death occurred. Vance, who was acquainted with Emery, had walked with him on numerous prior occasions, and had been with him for about half an hour and walked with him several blocks, just before the accident, testified that on this occasion Emery walked his normal gait, did not stagger or weave from

side to side, but proceeded in a direct line, and that he noticed no difference in his speech or articulation between that night and any other time.

Upon all the evidence it was a question of fact for the jury whether Emery was guilty of contributory negligence.

The evidence of the autopsy physician, even if it stood alone, would not compel a finding in defendants' favor on that issue, for while evidence of a plaintiff's intoxication is admissible on the issue of his contributory negligence, in an action such as this (38 Am.Jur. 1019; 45 C.J. 1244), intoxication does not of itself constitute negligence but is merely a circumstance to be considered by the jury in determining whether the intoxicated person was negligent (45 C.J. 997; 38 Am.Jur. 884). It does not, of course, constitute an excuse for abating the care which an ordinarily prudent sober person would exercise under the circumstances. (45 C.J. 997; 38 Am.Jur. 883.) Moreover, the testimony of the autopsy physician was to some extent disputed by that of Vance, which tended to show that Emery's intoxication, if any, at least had not advanced, at the time of the accident, to the stage where it had an apparent effect on his conduct.

Because of the testimony of Vance and Morris, the only eyewitnesses, who agree that Emery did not turn his head in either direction as he crossed the street, defendants contend that Emery was negligent in failing to look for danger before or while he crossed the street. This is not the only possible view of the situation. As Emery stood at the northeast corner and as he walked west across Beaudry Avenue, he was facing west, in the direction from which the bus approached; and even after he was out in the street, the bus on Third Street, as it approached the intersection for its turn, especially if it cut the corner, as several witnesses said, would be within range of his eyes, so that he could see it without turning his head. Taking this view of the facts and considering the evidence that after Emery got into the street he began to walk fast or trot, the jury may have inferred that he did see the approaching bus and recklessly proceeded in front of it in an attempt to beat it past the crossing of their paths. On this view of the matter, or on the theory that he failed to look at all for danger, the finding of contributory negligence would be supported. (See *Jonas* v. *Los Angeles Ry. Corp.* (1943), 57 Cal.App.2d 824, 827 [136 P.2d 39].)

■ But an inference that Emery was not negligent could also have been drawn. In the first place, if he saw the bus coming down Third Street, it did not constitute a danger to him so long as it proceeded on Third Street and he would not be required to look out for it further until he had reason to expect a turn. There is no evidence that he was informed of its route or should for any reason have anticipated the turn before it was begun. When the turn was begun he was some distance out in Beaudry Avenue; according to Vance he was only two or three feet east of its center line. If the turn was commenced back of the west line of Beaudry and the bus cut the corner, as some of the witnesses said, Emery could easily have seen it without turning his head. In view of the presumption of ordinary care that applies in such cases (*Westberg* v. *Willde* (1939), 14 Cal.2d 360, 367 [94 P.2d 590]), the jury could properly infer that he did look and see the bus as it started to turn. If he did, he would be struck in the eyes by the rays of its headlights when they ''picked him up,'' as the bus driver put it. While there is no testimony as to the exact degree of their brightness, undoubtedly they were somewhat blinding and confusing and could very well have given him the impression that the bus was headed directly toward him. One who thus suddenly finds the headlights of a motor vehicle pointed directly at him has two choices, in the effort to escape from it; he may hastily retreat or he may hurry forward. In this case Emery hurried forward. His conduct in doing so must be judged by the well settled rule that ''a person suddenly confronted with an unexpected danger, without any fault on his part, is only required to use such means for avoiding the danger as would be used by a person of ordinary prudence under similar circumstances, and he is not held to that strict accountability which would require that the course chosen be the most judicious one.'' (*Mortensen* v. *Fairbanks* (1934), 1 Cal.2d 489, 492 [35 P.2d 1030].) By the application of this rule it could properly be found that Emery was not negligent. ■ The plaintiffs requested an instruction stating this rule but it was refused and no other instruction on the subject was given. Defendants do not deny that plaintiffs' proposed instruction was a correct statement of the law, so we do not set it forth here. The only justification advanced by them for the refusal of the instruction is that Emery by his own negligence got himself into the position of danger, and hence the rule above stated does not apply to the case. But, as we have already

stated, the evidence is susceptible of a construction which frees him from negligence up to the time the sudden danger confronted him. The rule was, on that construction, fully applicable to the case, and it was error not to'give the requested instruction or some other stating the same rule. (*Varner* v. *Skov* (1937), 20 Cal.App.2d 232, 238 [67 P.2d 123].)

█ Under the circumstances of this case we think this error must lead to a reversal. As already stated, the preponderance of the evidence appears to be that defendants were negligent in cutting the corner, and if they were, this negligence was obviously a proximate cause of the collision, for Emery would have cleared the path of the bus had it kept to the right of the center line of Beaudry Avenue. The question of Emery's contributory negligence is a close one on the evidence, and we cannot say that a different verdict would not have been returned had the jury considered the evidence on that point in the light of the law properly applicable thereto.

The appeal from the order denying plaintiffs' motion for a new trial is dismissed. The judgment appealed from is reversed.

Desmond, P. J., and Wood (Parker), J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied January 20, 1944. Edmonds, J., voted for a hearing.