270 P.2d 841

**MATHESON**

v.

**IDAHO HARDWARE & PLUMBING CO., Limited et al.**

No. 8020.

Supreme Court of Idaho.

April 28, 1954.

Rehearing Denied June 3, 1954.

J. F. Martin and C. Ben Martin, Boise, for appellants.

Elam & Burke, Boise, for respondent.

TAYLOR, Justice.

On August 21, 1952, at a few minutes past 1:00 o'clock p. m., a collision occurred between a truck, owned by the defendant (appellant) Idaho Hardware & Plumbing Co., Ltd., and driven by its employee, Fay Smith, defendant (appellant), and a motorcycle owned and operated by the plaintiff (respondent). The collision occurred in the city of Boise, on 8th Street at a point approximately 94 feet south of the south curb line of Myrtle Street, which intersects 8th Street at right angles. Eighth Street extends in a generally north and south direction.

The plaintiff, a youth of twenty years, suffered personal injuries in the collision and brought this action to recover damages, alleging that negligence on the part of Smith in the operation of the truck was the proximate cause of the injuries sustained. The defendants allege negligence on the part of the plaintiff as the proximate cause of the collision. From a judgment on the verdict in favor of the plaintiff, defendants appeal. The sole issue presented is the sufficiency of the evidence to support the judgment.

The facts are briefly as follows: August 21, 1952, was a clear, hot day and the pavement was dry. Eighth Street is a designated arterial or through street, and the maximum legal speed limit thereon is thirty miles per hour. Stop signs are maintained at the points of entry from intersecting streets and there was such a sign on Myrtle Street at the point where defendants' truck entered the intersection. Smith, the driver, and a co-employee had just finished their lunch period and were on their way to a warehouse of their employer on 8th Street. They approached 8th Street from the east on Myrtle Street and came to a full stop near the center line opposite the stop sign. Smith, by extending his arm, indicated a left turn. A vehicle behind him pulled up to his right and made a right-hand turn onto 8th Street. Smith looked to the north and observed the plaintiff on his motorcycle going west across the sidewalk and through a way in the curbing which opens onto 8th Street from a service station some forty or fifty feet beyond and north of the intersection of 8th and Broad Streets. Broad Street is a street running parallel to Myrtle and intersecting 8th Street one block to the north. Smith then looked to the south and, observing no oncoming north bound traffic

on 8th, proceeded into the intersection. He testified he had attained a speed of ten miles per hour in traversing the intersection, and that when he had half completed his turn he again observed the plaintiff approaching the intersection from the north at what he described as a high rate of speed, and at a point one-third to one-half of the way up the block from the intersection. Asked why he did not stop at that point, he replied: "I thought it best to get in the main line of traffic. There was still quite a distance between us." Smith then completed his turn, entering the west side of 8th Street near the center line and proceeded south parallel to the center line, with the left side of the truck approximately three feet to the west of the line. In making this turn he did not go around the center point of the intersection, but angled more or less directly across from his starting point to where he entered the south bound lane on 8th. After making the turn the speed of the truck was increased to approximately fifteen miles per hour.

The plaintiff testified that he had just finished his lunch at a "drive-in" or "curb-service" across from the service station at the intersection of 8th and Broad Streets; that he went across to the service station where he had parked his motorcycle, mounted it and proceeded south on 8th Street. His purpose was to return to his employment on the south side of the Boise River where he was due at 1:00 o'clock. The service station being on the east side of 8th,

he crossed the sidewalk and entered 8th on a way for vehicles entering and leaving the station, and about forty feet north of Broad Street. Proceeding south on the west side of 8th Street, he accelerated his speed, but said he did not exceed twenty-five to thirty miles per hour. As he approached the Myrtle Street intersection, and at a point about forty feet from the north curb line thereof, he first saw defendants' truck entering the intersection and about a distance of four to six feet within the intersection. Observing that the truck would block his path, and allowing for reaction time, he said he applied his brake about fifteen feet north of the north curb line of Myrtle Street, and that thereafter he intermittently applied and released the brake and swerved to his right; that when he reached a point in the intersection and near the west curb of 8th Street he had reduced his speed to ten miles per hour, and there released his brake entirely, because there was danger the machine would skid from under him and it was necessary to do so in order to straighten it up. At that point he observed the truck nearby on his left; that he then accelerated his speed, entering 8th Street south of the intersection at a point six feet out, or east, from the curb line, and, then, as follows:

"Q. What happened as you got to this point? A. I could see that the truck was somewhere in this neighborhood in there, and he was continuing on his course, but I recall I thought for

a moment there that he would slow down and maybe give me a chance to go on around, and that is the reason for a brief spurt when I turned on the motorcycle fuel to accelerate it more.

"Q. How brief a spurt was it? A. Just a moment of time.

"Q. What did you do then? A. Then as the truck began to continue on in his course, not giving me any acknowledgment whatsoever, he kept crowding me over into this part of the pavement in here (pointing) and then I began to apply the brakes again.

"Q. Why did you apply the brakes again? A. Because I could see that there was a car parked down in here that I might come in contact with."

There were no cars parked in the parallel parking area on the west side of 8th Street, south of the Myrtle Street intersection, for some distance to the south, the first parked car in that area being opposite the point of impact. The rear end of the car so parked was approximately eighty feet south of the south curb line of Myrtle Street. He had increased his speed up to a rate between 15 and 20 miles per hour. Upon seeing that he might not be able to pass the truck before reaching that car, plaintiff again applied his brake, and traveled south in the unoccupied parking area into which he said he was crowded by the truck. He had slowed down to five miles an hour when he collided in a glancing manner with the left rear fender of the parked car, and skidded into and under the truck on the right side thereof, as the truck was passing the parked car. A photograph (plaintiff's exhibit 8) of skid marks made by the motorcycle when the brake was applied the second time, shows that the vehicle entered 8th south of the intersection, a little farther out from the curb than the parking area extends, and then entered the parking area on a slant as it proceeded south. This tends to refute plaintiff's testimony that Smith made a sweeping turn and crowded him into the parking area.

Eighth Street is fifty feet wide. The parked car was 5' 10" wide and standing with its right wheels 18" from the curb; the truck bed was 8' wide and traveling at a distance of 3' west from the center line, it would occupy 11' on the west half of the street. That would leave 6' 8" between the passing truck and the parked car. Following the collision, the rear, dual wheels of the truck skidded the motorcycle along the pavement, where it came to a stop 20 to 22 feet south of the point of impact. These skid marks made by the motorcycle commenced at a point in line with the front edge of the front wheels of the parked car, and fourteen feet out from the west curb line of 8th Street.

Plaintiff's witness, Obenchain, testified he was sitting in a parked car on 8th, about midway between Broad and Myrtle Streets; that he observed the motorcycle coming down 8th Street and as it approached Myrtle Street, he saw the truck in the in-

tersection "just about as his front wheels crossed the yellow line". Asked, "Approximately how much of his turn had he completed when you first noticed the truck?" he answered, "Well, he was just about a 45 degree angle." At that time the cyclist was approximately a car length from the north line of the intersection; that he applied his brakes at that point; that he skided some distance and appeared to turn into Myrtle Street, then released his brakes, then .skidded again. Afterward the witness saw skid marks which commenced approximately fifteen feet north of the intersection and at that point he saw red glass upon the pavement, which he thought was reflector or light glass which had fallen from the motorcycle when the brakes were applied.

Plaintiff's witness, Herndon, office manager of the Peasley Transfer & Storage Company, which occupied the building on the northwest corner of the intersection, testified that 8th Street was generally heavily traveled; that he heard brakes squeal, looked up and observed the motorcycle; that its brakes were applied just north of the intersection; that he followed its course and in doing so saw the truck proceeding south on 8th Street; that the motorcycle and the truck traveled south parallel to each other; that the brakes were applied at two different intervals, first, when his attention was attracted by their squealing, and after being released they were applied again.

Plaintiff's witness, Gilmore, a police officer, who arrived on the scene shortly after the collision, and made measurements of relevant distances, testified the skid marks made by the motorcycle commenced a short distance north of the intersection and continued south veering to the west, intermittently—that is, heavy and light—and weaving snakelike across the intersection to a point near the south line of the intersection, and then again parallel to and in the parking area on 8th Street south of the intersection. The total distance from the point where the skid marks began to the point of impact was 161 feet.

Defense witness, Rosecrans, a deputy sheriff, and defense witness, Kelly, an experienced motorcycle operator, testified they made experimental tests of the distance required to stop the motorcycle involved in the collision, on dry pavement of the same character as that at the intersection of 8th and Myrtle Streets, with the same tires and brake, and that at twenty miles per hour when the brake was applied it skidded 20' 4", and at thirty miles per hour it skidded 52' 10". These tests were made under conditions involving no emergency, or any occasion to veer the machine out of the line of its travel while its brakes were applied.

Defense witness, Russell, who was at the drive-in, where plaintiff had his lunch, and watched him leave the service station, said he traveled south on 8th Street at approximately 25 to 30 miles per hour.

Defense witness, Shirley, sitting in a car double-parked about 100 feet north of the Myrtle Street intersection, facing south, heard the motorcycle accelerated as it approached him from the rear and observed its speed as it passed his car, testified, "I knew that he was going at an excessive rate of speed." and "I would say at least 35 miles, maybe more." That the next thing he observed was "when he applied his foot to the brake the motorcycle almost jumped out from under him and started to bounce." At that time it was 50 or 60 feet in front of him and 40 to 50 feet north of Myrtle Street, and "the rear wheel was skidding and jumping from just one side to the other." That at the time he first noticed the truck it "was almost straightened up onto 8th Street, going south," and that he thought he saw the motorcycle and the truck at approximately the same time, and that from the time he first heard the motorcycle to his rear, its speed continued to accelerate until the brakes were applied. Mrs. Shirley, who had just alighted from her husband's car, and gone around to the north and back of the car, intending to cross 8th Street to the east where she was employed, said, "It was coming down the street making a lot of noise and coming real fast, and I was just around to the back of the car when it flashed by me. * * * It was going very fast." Asked if she could estimate the speed, "No, except that I know that he was going faster than most cars go along that street." "I started

across the street and I just got a little ways —well, I heard the squeal of tires, I guess, and I looked up and saw the motorcycle under the back wheels of the truck."

Defense witness, Freize, was standing by a window, possibly 75 feet or more north of the intersection. He testified he heard the motorcycle "revving up very fast, and the next thing we knew he was in front of us." He estimated the speed at 40 miles per hour, and observed, as the operator alternately applied the brakes and let up and then applied them again, the motorcycle seemed to skid and jump. He also testified he had observed the truck stop at the stop sign and that when he saw the motorcycle the truck "was in the intersection going down the street"; and that when the motorcycle started braking "this truck was already pulling around here." (The witness was testifying with a map of the intersection before him, and indicating the position of the vehicles on the map. The record does not show just where in the intersection he located the truck at that time.)

The witness, Bates, who was inside the same window with the witness, Freize, testified he was attracted by the noise of the motorcycle, and that when it got in front of his place "he shifted gears" and that "it looked like it took off the ground. That is exactly what it looked like. He just reared up." He estimated the speed at 55 miles an hour; that the brakes were applied immediately after it passed his window

and "it seemed to kind of swerve and jump as it went along," and "it seemed like he slowed down and speeded up again."

The witness, Warner, who was at the service station from whence the plaintiff commenced his ride, testified that plaintiff entered the street from the station at a point about fifty feet north of the intersection of 8th and Broad Streets; that he set out at an excessive speed. The witness estimated plaintiff had attained a speed of 20 to 30 miles per hour just after he had crossed the Broad Street intersection, and that he built up speed as he proceeded south.

The block from Broad Street south to Myrtle is three hundred feet long. Broad and Myrtle Streets are each fifty feet wide. It also appears from the testimony that 8th Street is ordinarily heavily traveled, but at this particular time there was not much traffic moving upon it. Traffic had just begun to pick up after the noon lull.

It is apparent from the foregoing facts that there is no substantial evidence of negligence on the part of the driver of the truck. Had he known at the time he observed the motorcycle entering 8th Street more than a block to his north, and immediately after which he started into the intersection, that the cyclist would turn south on 8th and proceed at the speed he did toward Myrtle Street, it would of course have been more prudent to remain longer at the stop sign. But, as it was, observing no traffic interfering from either direction, he proceeded into the intersection and, after having completed half of his turn onto 8th, he again observed the motorcycle still at sufficient distance to the north that he thought it best to get into the main line of traffic and proceed south out of the intersection.

It is urged that he could have stopped at that point. But, at the speed plaintiff says he was traveling, he would be going 44 feet per second, and it is observed there was not much time for deliberation, whether we accept plaintiff's testimony, as to how close he was to the intersection, or that of the defendant Smith. Smith must be presumed to have been aware that to stop he may have risked a collision from his rear or from his left. He must also be presumed to have known that the law requires an overtaking vehicle in passing another going in the same direction, to pass to the left, § 49–512, I.C., and that the plaintiff in compliance with the law might undertake to turn to the left in order to pass. To say that there was no traffic from the rear, nor from the left and that the plaintiff did not undertake to pass to the left and that, therefore, Smith could have safely stopped midway through the intersection and allowed plaintiff to pass, is not of itself sufficient to establish negligence in his failure to do so. Nor does it appear negligent on his part to have completed his turn, and to continue south at an accelerated speed. It would seem, if plaintiff needed additional space either to stop or get his motorcycle

under control, that was the best way for the truck driver to provide it for him.

On the other hand, the evidence is quite overwhelming that there was negligence on the part of the plaintiff which was the proximate cause of the collision. It is evident that he approached the intersection at a negligent rate of speed, and that upon observing the truck in the intersection he had difficulty in controlling the movements of his machine, and after slowing it down to a speed of 10 miles per hour, he again accelerated to 15 or 20 miles per hour with the purpose in mind of passing the truck on the right, when he again discovered an obstruction in his path and again applied his brakes.

We are inclined to view the entire evidence on the issue of negligence on the part of the plaintiff as sufficiently conflicting, as to certain material facts, to require the application of the rule that in such cases the question of contributory negligence is for the jury. However, even so assuming, it is still necessary to find negligence in the conduct of the defendant Smith in order to sustain the judgment. As we have seen, the only way this could be done would be to impose upon Smith the duty to make a correct diagnosis of the entire situation in a matter of seconds and to have thereupon stopped midway in the intersection. The law allows a plaintiff, seeking damages for negligence, to excuse himself for an error in judgment occasioned by an emergency. There is no reason why the same rule should not be applied to a defendant, particularly where the emergency was not created by any negligence on his part. If any emergency confronted the parties at this point it was created by the plaintiff. At the time Smith saw the cyclist approaching the intersection, he was a sufficient distance to the north that Smith was justified in concluding that he was not in imminent peril, and that he would be able to avoid a collision. Under such circumstances Smith could not be held on the theory that he had the last clear chance to avoid the accident. The doctrine of last clear chance was neither pleaded nor urged in this case. Moreover, the plaintiff did actually slow his machine down to 10 miles per hour, a speed from which it could have been safely stopped before reaching the parked car, had he not again accelerated it in an effort to pass the truck on the right. Thus he created a second emergency which, except for the sound of his motor, was unknown to Smith. Under these circumstances, the evidence would not support a verdict against Smith on the theory of "last clear chance."

Generally speaking, negligence is never presumed. 65 C.J.S., Negligence, § 204. The mere happening of an accident or the occurrence of injury does not give rise to a presumption or inference of negligence. 65 C.J.S., Negligence, § 220(1). The burden was upon the plaintiff to establish negligence on the part of defendant Smith, and that such negligence was the

proximate cause of his injuries. Clark v. Chrishop, 72 Idaho 340, 241 P.2d 171; 65 C.J.S., Negligence, §§ 207, 208 and 209; 38 Am.Jur., Negligence, § 285. The facts indicate that the plaintiff has failed in both of these elements of his case. In addition to the want of negligence on the part of Smith, it appears that the more remote proximate cause was excessive speed on the part of the plaintiff, and that the immediate proximate cause was the acceleration of the motorcycle, after it had been slowed down to 10 miles an hour, for the avowed purpose of passing the truck. Stearns v. Graves, 62 Idaho 312, 111 P.2d 882; Chatterton v. Pocatello Post, 70 Idaho 480, 223 P.2d 389, 20 A.L.R.2d 783; Clark v. Chrishop, 72 Idaho 340, 241 P.2d 171, 65 C.J.S., Negligence, § 103, p. 645; 38 Am.Jur., Negligence, § 54.

The judgment is reversed and remanded with directions to dismiss the action. Costs to appellants.

KEETON, J., and BAKER, District Judge, concur.

THOMAS, Justice.

I dissent.

The only issue presented on appeal is the sufficiency of the evidence to support the verdict and judgment.

The majority opinion has set forth a version of the evidence contrary to that impliedly found by the jury.

It is not a question here of determining whether a verdict and judgment in favor of defendant would have been sustainable but whether this court can say as a matter of law that the verdict and judgment for the plaintiff are not sustainable when viewing the testimony and all reasonable inferences that may be drawn therefrom in the light most favorable to plaintiff as this court must do. If as a matter of law the verdict and judgment for the plaintiff are supported by the evidence viewed in the light most favorable to plaintiff then the majority opinion has invaded the province of the jury. This I earnestly urge it has done.

In this dissent I am, as I feel I must do, accepting the testimony and all reasonable inferences that might be drawn therefrom in the light most favorable to plaintiff. All conflicts in the evidence were resolved by the jury and it is not for this court to either disturb or resolve them.

A duty was imposed upon Smith to maintain a proper lookout before entering and while proceeding across the intersection; likewise he was duty bound before starting or turning from the intersection of Myrtle and 8th Streets to first see that such contemplated action could be made in safety to other vehicles; he was required under the provisions of Ordinances No. 21–325 and No. 21–319 of Boise City, Idaho, to enter 8th Street, an arterial highway, cautiously and yield the right of way to Matheson if he were then in the intersection

or approaching it at a lawful speed so closely as to constitute an immediate hazard, otherwise he was negligent; moreover, if Matheson was confronted with an emergency upon entering the intersection, not caused in whole or in part by him, he was not necessarily negligent in thereafter choosing the course to pursue, the precautions to take, the choice or maneuver to make in order to avoid an accident if he exercised the care that a reasonably prudent person would exercise under the same or similar circumstances.

The question of negligence and contributory negligence with respect to maintaining a proper lookout, entering an intersection cautiously and sudden emergency is for the jury and never one of law unless the evidence is reasonably susceptible of no other interpretation than that the conduct of the injured party caused or contributed to his injury and that because of his negligence he did not act as a reasonably prudent person would have acted under the same or similar circumstances. Viewing the evidence and all the favorable inferences that may be drawn therefrom in the light most advantageous to plaintiff, as this court must do, it is not reasonably susceptible to only one interpretation to the effect that the conduct of plaintiff caused or contributed to his injury and that because of his negligence he did not act as a reasonably prudent person.

The majority opinion in interpreting the evidence has not only failed to construe the evidence and all favorable inferences that might be drawn therefrom in the light most favorable to plaintiff but has interpreted it in a light most favorable to defendants; moreover, throughout the opinion, testimony in support of defendants has been accepted as facts in the face of sharp conflicts; the majority opinion has invaded the province of the jury in these respects.

Smith, who had been proceeding west on Myrtle Street, stopped his truck, not at the curb line of 8th Street, but approximately 8′ east of the curb line; on both sides of 8th Street in the block between Myrtle and Broad Streets cars were parallel parked next to the curb. He looked to the north along the sidewalk and saw the motorcycle pass to the west of the curb at a point north of the intersection of Broad Street and 8th Street as Matheson was leaving the "76" Service Station; he then looked to the south and signaled for a left turn. Another car which was then behind him moved to his right on Myrtle Street, made a right turn and proceeded north on 8th Street; Smith then looked south again and immediately proceeded into the intersection without looking north again.

With reference to seeing the motorcycle later and when Smith was about one-half way between the east curb line and the center yellow line of 8th Street, he testified as follows:

"Q. And when you saw him up about one-third to one-half of the way down the block when you were at this

position, about how fast would you say he was going at that time? A. Pretty high rate of speed.

"Q. And you knew that, didn't you? A. I realized it at that position, yes.

\* \* \* \* \* \*

"Q. When you saw that motorcycle speeding like it was down that street, Mr. Smith, did it occur to you to stop and let it go by? A. No, sir.

"Q. Why is that? A. I thought it best to get in the main line of traffic. There was still quite a distance between us there.

"Q. But you could see it was bearing right down on you? A. Yes, sir.

"Q. Did you hear it? A. Yes.

"Q. Did you hear it from the time it left the Davidson Service Station up there? A. Yes.

"Q. Was it making quite a noise? A. Yes.

\* \* \* \* \* \*

"Q. Was there any time from the time you started at that stop sign and got all the way around the corner that you didn't hear the noise of the motorcycle? A. Well, not that I recall.

\* \* \* \* \* \*

"Q. You didn't hear any squealing of brakes? A. I heard a rev up and then it died down and revved up again.

"Q. After that did you have occasion to look in the rear view mirror to see what was happening? A. I tried to spot him but I didn't locate him.

"Q. Did you think of slowing down or stopping? A. No, sir."

Smith testified that as he entered the intersection he pursued a diagonal course (which would be favorable to Smith if believed by the jury), traveling at approximately 10 miles an hour, until he had proceeded across the yellow line of 8th Street; that he could have stopped his truck within a distance of 5' to 6'.

In conflict with this testimony the operator of the motorcycle stated that he was proceeding south along 8th Street between Broad and Myrtle Streets at between 25 and 30 miles an hour and that he first saw the truck when it was from 4' to 6' in the intersection, traveling at a speed of from 7 to 10 miles an hour and making a sweeping turn. Under the testimony of the operator of the motorcycle he observed Smith when Smith was only 4' to 6' in the intersection and he himself was within 40' of the intersection, yet Smith did not observe the operator of the motorcycle until he, Smith, had traveled approximately 13' into the intersection and the operator of the motorcycle at that time was at least 100' north of the intersection; it is a physical impossibility that both of them could be right; if Matheson's testimony is believed, had Smith looked to the right immediately before entering the intersection he was bound to see Matheson slightly in excess of 40' north of the intersection at that moment.

The driver of the truck entering the intersection was under a duty to maintain a proper lookout. This duty on approaching and traversing an intersection is not satisfied by a simple act of looking or a fleeting glance; he must look observantly and with effect in such a way that the purpose of looking is accomplished; such observations must be made with due care as the circumstances demand and when looking will apprise a reasonably prudent person of the conditions confronting him at the intersection; moreover, when approaching and traversing an intersection such a motorist will be deemed to have seen what he could and should have seen and he is under a duty to see what is visible and in plain sight. The mere fact that he looked will not excuse him if he did not see what was apparent as in such a case his failure to see constitutes negligence under the law as though he had not looked at all. 60 C.J.S., Motor Vehicles, § 353, p. 836–842. While he was not bound to initially stop at the edge of the curb line extended, he was duty bound to look to his right as well as his left from a position where he could observe approaching traffic before undertaking to proceed across. Plenderlieth v. McGuire, 27 Wash.2d 841, 180 P.2d 808.

In considering whether a driver about to enter an intersection of a through street so far in advance of another vehicle moving along the arterial street that a reasonably prudent person would be justified in believing he could enter the intersection and make a left turn without danger of collision, all factors, including the distance intervening, the apparent speed of the approaching vehicle, the presence or absence of other vehicles on the through street and other related facts must be considered by the jury. Goddard v. Armour & Co., 136 Pa.Super. 158, 7 A.2d 79. See also McAmbley v. Martin, 100 Pa.Super. 593; Fraser v. Voight, 100 Pa.Super. 248.

Where it would appear to a reasonably prudent person that a vehicle approaching an intersection on an arterial highway is near enough to the intersection to constitute an immediate danger and the driver of the other vehicle attempts to cross the arterial highway, he is negligent in doing so although he was the first to arrive at or enter the intersection. Pattisson v. Cavanagh, 18 Cal.App.2d 123, 63 P.2d 868, 64 P.2d 945; Paul v. Key System, 80 Cal.App. 2d 21, 180 P.2d 940.

Whether defendant Smith, who looked once to the right along the sidewalk from a point 8′ east of the curb line extended and then looked again to the south after the other car had pulled out and turned to the right, maintained a reasonably adequate lookout in view of these facts and circumstances before proceeding into the intersection was for the jury to determine. Plenderlieth v. McGuire, 27 Wash.2d 841, 180 P.2d 808. Had Smith looked to the north a second time before entering the intersection rather than being satisfied with one look before the other car pulled along

side of him, followed by looking to the south a second time and then proceeding out into the intersection immediately after the other car had made a right turn and proceeded north, he could have seen plaintiff's motorcycle before he started into the intersection under the testimony of the plaintiff which the jury believed. At the time Matheson was 40′ north of the intersection defendant was 4′ west of the east curb line. Smith, traveling at 7 miles an hour, would travel approximately 22′ before clearing the intersection if he traveled on a straight course. This he did not do. He would travel in excess of 25′ if he made a sweeping turn. To do this would take approximately 2.44 seconds; on the other hand, if Matheson was traveling approximately 25 miles an hour at a point 40′ north of the intersection when he first saw Smith 4′ out in the intersection, making no allowance for braking and reducing his speed, he would travel the distance of 90′ through the intersection in approximately 2.46 seconds; hence they would clear the intersection at about the same time, as Matheson testified they did; whether Smith maintained a proper lookout under this evidence, viewed in the light most favorable to plaintiff, was of course for the jury.

Smith was the disfavored driver, sec. 49–520, I.C., and the burden rested heavily upon him to look out for and give way to traffic which enjoyed as to him, as Matheson did, the right of way. Matheson's motorcycle was there to be seen, not only when Smith was 4′ out in the intersection but before he had entered it had he looked again to the right before proceeding to enter. He cannot escape liability by saying he did not see the approaching motorcycle which was on the favored street and approximately 40′ north of the intersection when he entered the intersection. Whether he fulfilled his duty with respect to maintaining a proper lookout, Silverstein v. Adams, 134 Wash. 430, 235 P. 784; Strouse v. Smith, 166 Wash. 643, 8 P.2d 411; Hoenig v. Kohl, 182 Wash. 245, 46 P.2d 728, and entering and proceeding across the intersection, Van Tine v. Cornelius, 355 Pa. 584, 50 A.2d 299; Steckler v. Luty, 316 Pa. 440, 175 A. 481, was for the jury.

If we assume that Smith entered the intersection cautiously he has not discharged his full duty unless he yields the right of way when a collision with a vehicle approaching in the favored direction, as the plaintiff was, is reasonably to be apprehended unless he does so; under such circumstances it is his duty to slow down or even stop if this is necessary to permit the passage of the other vehicle ahead of him. 60 C.J.S., Motor Vehicles, § 363, pp. 891–892.

It is apparent under Smith's own estimates of speed and distance that the jury would be justified in disbelieving him and in concluding that he did not meet the duty imposed upon him to ascertain that his contemplated action in moving out into the intersection could be made in safety to

other vehicles and that he did not enter 8th Street, which is an arterial highway, cautiously nor yield the right of way to Matheson who was then approaching the intersection at a lawful speed and within such proximity thereto as to constitute an immediate hazard.

Viewing the evidence from still another approach, Smith testified that when he had proceeded out into the intersection about half way he looked to the right and saw Matheson one-half block or 150' to the north. From the point he made such observation, under his testimony, Matheson had 200' to travel to clear the intersection; he was traveling 30 miles an hour. Without allowance for braking and reducing his speed, Matheson would clear the intersection in approximately 4.56 seconds; Smith had 13' to travel to reach the center line of the intersection and allowing him an additional 3' to clear the intersection by making a left turn and traveling at 10 miles an hour it would take him 1.09 seconds to clear the intersection and complete the left turn; if his testimony in these respects is to be believed he would have cleared the intersection at least 3.47 seconds in advance of Matheson, and then proceeding south at 15 miles an hour he would not have in anywise trapped Matheson and would have been some 76' south of the intersection at the time Matheson cleared it. Under the evidence this did not happen.

From the evidence the jury could believe that Smith had not completed a sweeping left turn when Matheson entered the intersection; also as Matheson testified the truck turned directly in front of him and if he continued on his course he would contact the right rear side of the truck; at this point there were no cars parallel parked so he turned the motorcycle to the right with the brakes still applied, causing the motorcycle to lean and threaten to tip over on the right near the west curb just south of the curb line of Myrtle Street extended; that in order to avoid having the motorcycle skid from under him and as an aid to straighten it out he immediately let up on the brakes; that at that time the truck was crowding him, making it necessary for him to move closer to the west curb line; that the operator of the truck showed no signs of either giving him a right of way or slowing down.

The entire testimony of Matheson with reference to what took place from the time he entered the intersection to the point of impact, some 80' to 90' south of the south curb line of Myrtle Street extended, is to the effect that the truck was crowding him to the west and that he was intermittently releasing and applying his brakes in an attempt to keep the motorcycle upright and to take advantage of any opportunity which might arise to safely pass the truck. Whatever variations in speed he attained after moving through the intersection, he did not overtake and pass the truck which was traveling only 15 miles an hour.

Plaintiff's Exhibit 8 and Defendants' Exhibit "C" clearly show the application and release of plaintiff's brakes and the course he was traveling a short distance prior to the time he lightly bumped against the right rear fender of a car which was parallel parked on the west side of the street. The exhibits disclose that a short distance north of the parked car he was close to the west curb and heading directly into the parked car or the curb unless he changed his course; that he abruptly changed his course to the east in an apparent effort to avoid striking the curb or the car; the right handlebar of the motorcycle struck the left rear fender of the parked car at a time when the truck was almost opposite to it.

After bumping the fender of the parked car both Matheson and the motorcycle were thrown beneath the truck and dragged 22' before the truck stopped. Neither exhibit shows any tracks of the truck north of the point where it stopped.

Without reviewing in detail the evidence of other witnesses, suffice to say nearly all the witnesses who observed the operation of the motorcycle at any time after it had left a point 40' north of the intersection of Myrtle Street and 8th Street testified to intermittent application and release of the brakes and the swerving of the motorcycle as did plaintiff himself.

If at all important, viewing the evidence in the light most favorable to plaintiff there was not ample space between the truck and the parked car for the motorcycle to have safely passed; the parked car which was 5'10" wide was parked 18" from the curb; there is no evidence that the wheels of the car were 18" from the curb but a space of 18" from the curb to the car; the truck was 8' wide; the distance from the center line to the left tires of the truck at the point of impact, and not necessarily at the point it stopped some 22' south, could well be in excess of 5'; the width of the street from the curb to the center line is 25', hence it is possible that the opening between the parked car and the truck at or near the point of impact would be less than 5'; the spread or width of the handlebars of the motorcycle was 3'; the operator of the motorcycle would thus have a clearance of approximately 1' on each side to maneuver the motorcycle through the opening without contact with either the moving truck or the parked car.

I will now turn to the testimony with reference to the relative movements, speed and positions of the truck and motorcycle as they moved through and beyond the intersection. Matheson testified that just prior to getting through the intersection he released his brakes because the motorcycle was swerving to the right and was about to tip and at that time the truck which was in the process of completing a wide-sweeping left turn was about opposite his motorcycle which was approximately 6' from the west curb line of 8th Street; that he could

not give an estimate of how close the truck was to him but he recalled that he could see the stake rack of the truck; he testified that it was necessary for him to attempt to move his motorcycle along the west side of the curb in the area where cars would normally be parallel parked because the truck was crowding him and did not appear to acknowledge his presence or give him an opportunity to pass. The testimony of Matheson, particularly with reference to what occurred from the moment the motorcycle was opposite the truck after both had passed through the intersection to the point of impact reveals, in substance, that he was crowded to the west between the truck and the curb and that he intermittently released and applied his brakes not only in an attempt to keep the motorcycle upright but also in order to take advantage of any opportunity to pass the truck with safety.

At no time after both vehicles had cleared the intersection did Smith or Glenn see Matheson although he was proceeding down the highway opposite the truck a goodly portion of the distance, but never overtaking it; the window of the truck was down yet Glenn neither saw nor heard the motorcycle then nor at any time previously; Smith, the driver of the truck, testified that he looked through the left rear view mirror to locate Matheson because he had heard the motorcycle from the time it had left Broad Street and heard the operator rev the motor south of the intersection;

that even though he could see through the left rear view mirror for a distance of some 150′ north along the highway, except for a blind spot behind the truck, he was unable to spot Matheson and it never did occur to him to reduce his speed or to stop; both Smith and Glenn testified that the truck proceeded south along a straight line, close to the center line, as Smith testified, and within one foot thereof, as Glenn testified; on the other hand, Matheson testified that the truck for the greater portion of the distance was crowding him to the west.

Some of the pictures taken at the scene of the accident, particularly Plaintiff's Exhibit 5 and Defendants' Exhibit "A" show that at the point where the truck stopped following the collision the left wheels were approximately 4′ west of the yellow line; moreover, the same exhibits reveal that at the point where the first gouge marks of the motorcycle being dragged under the truck are shown the truck could well be further to the west at the point of impact; however, to what extent no accurate determination could be made from an examination of these exhibits. This was for the jury.

The truck traveled approximately 15 miles an hour after completing the left turn; the point of impact was approximately 80′ south of the intersection; at 15 miles an hour, 3.65 seconds were consumed in traveling to the point of collision.

As a general rule, where vehicles are traveling in the same direction the precise duties of the operator of the forward vehicle depend on the circumstances and he must exercise ordinary care under all such circumstances to prevent injury to the vehicle that may be following; where he knows, as Smith did by his own testimony, of the approach of a vehicle from the rear, his use and occupation of the highway must be reasonable under all such circumstances and he must not unduly obstruct such highway. 60 C.J.S., Motor Vehicles, § 322, pp. 743–745. This was also for the jury.

If the testimony of Matheson is to be believed as the jury no doubt did believe it, Smith did not drive his truck south near the center line of 8th Street but drove west of the west one-half of the street for the greater portion of the distance south to the point of impact, tending to crowd Matheson toward the curb; at the point where the truck came to rest 22′ south of where the boy and the motorcycle fell under the right rear wheel of the truck, the east tires of the truck were some 4′ west of the center line; if they were not further west at the point of impact than at the point where the truck stopped Matheson had a clearance of 5½′ between the truck and the parked car or 15 inches on each side of the handlebars to maneuver through this opening; however, the jury might well believe the truck was still further to the west at the point of impact than it was where it stopped; there is no definite or positive evidence that the initial gouge marks of the motorcycle where it was dragged under the truck established the point of impact; there is evidence that the point of impact was approximately 13′ north of this point. An officer testified that in his opinion the actual point of impact was north of the commencement of these gouge marks; if this is so, as the jury might well believe, the point of impact would not be 94′ south of the south curb line of Myrtle Street extended but somewhere in the neighborhood of 80′ south thereof.

The evidence of Matheson up to the time he entered the intersection, if believed by the jury, is such as to free him from negligence at any point prior to moving south from the intersection; moreover, if the jury believed such evidence, defendant Smith was negligent in failing to maintain a proper lookout and without first seeing that his contemplated action of entering the intersection could be made with safety to other vehicles and without yielding the right of way to Matheson who was then so near the intersection and approaching at a lawful speed so as to constitute an immediate hazard.

If the evidence of Matheson is believed he was confronted with an emergency at the intersection occasioned by the negligence of Smith with no opportunity to exercise deliberate judgment as to which course he should then pursue; that he could not reasonably foresee or anticipate

the hazard or emergency which immediately confronted him and that he was hence placed in a position of immediate peril to himself without sufficient time to determine with any degree of certainty the best course to pursue in order to avoid the accident; that, moreover, when all the circumstances are considered, he exercised that degree of care a person of ordinary prudence would exercise under the same or similar circumstances.

Whether or not Matheson was confronted with an emergency upon entering the intersection and, if so, he thereafter upon discovery of the danger acted as a reasonably prudent person in view of all the circumstances was for the jury to determine. Campbell v. Jackson, 65 S.D. 154, 272 N.W. 293; Mortensen v. Fairbanks, 1 Cal.2d 489, 35 P.2d 1030; Lopez v. Wisler, 58 Cal.App.2d 455, 136 P.2d 816; Nicholas v. Fennell, 184 Or. 541, 199 P.2d 905; American Products Co. v. Villwock, 7 Wash.2d 246, 109 P.2d 570, 132 A.L.R. 1010; Lawe v. City of Seattle, 163 Wash. 362, 1 P.2d 237; Frenier v. Brown, 116 Vt. 538, 80 A.2d 524; St. Johnsbury Trucking Co. v. Rollins, 145 Me. 217, 74 A.2d 465, 21 A.L.R.2d 88; Paul v. Key System, 80 Cal.App. 2d 21, 180 P.2d 940; Restatement of the Law of Torts, Vol. 2, sec. 470, p. 1239; White v. Fenner, 16 Wash.2d 226, 133 P.2d 270.

The observations of the court in the case of St. Johnsbury Trucking Co. v. Rollins, supra, with reference to a sudden emergency are applicable in this instance and are set forth as follows [145 Me. 217, 74 A.2d 468]:

"It may well be that, in retrospect, it is demonstrable that had the plaintiff's agent held his course, brought his vehicle to a dead stop at the first *possible* moment there would have been neither collision nor upset. This, however, is deducible only by the use of 'hindsight'. But 'hindsight' is not available to a person faced with an emergency with which he is suddenly confronted and which requires instantaneous action upon his part. He must act promptly, taking into consideration the circumstances as they then present themselves.

"It is true that even though he was confronted by a sudden emergency created by the defendant's negligence, the plaintiff's agent was required to exercise ordinary care, that is, the care that the ordinarily prudent person would exercise under like circumstances, so that no want of such care on his part contributed to the damage suffered by the plaintiff. The burden of proof to establish this proposition was upon the plaintiff. It is to be remembered, however, that in such case the sudden emergency created by the defendant's negligence is one of the existing circumstances which must be considered in determining whether or not the plaintiff's agent was guilty of

contributory negligence. While the standard of care required is that which would be exercised by the ordinarily prudent person, it is only that degree of care which such person would use under *the same circumstances.*

"If one uses that degree of care which an ordinarily prudent person would have used under the same circumstances and in the same emergency, the emergency having been created by the negligence of the other, and without any prior negligence on his part contributing to produce the emergency, negligence cannot be predicated on such conduct. See Byron v. O'Connor, 130 Me. 90, 153 A. 809 and Coombs v. Mackley, 127 Me. 335, 143 A. 261. This principle of law is applicable whether conduct in issue be that of the plaintiff or the defendant. Under the circumstances disclosed by the evidence in this case, the governing rule is authoritatively stated in Coombs v. Mackley, 127 Me. 335 at page 339, 143 A. 261, 262, as follows:

" 'The question of ordinary care, depending on answers to other questions, some of law and some of fact, is properly left to the jury with appropriate instructions. Larrabee v. Sewall, 66 Me. 376. When a person is required to act in an emergency and in a place of impending personal peril, the law will not declare that reasonable care demands that he must choose any particular one of the alternatives presented. In such cases the law invokes the judgment of a jury. Blair v. Lewiston, A & W. St. Railway, 110 Me. 235, 85 A. 792. Unless in extreme cases and where the facts are undisputed, which of two alternatives an intelligent and prudent person traveling the highway should select as a mode of escape from collision the law will not say, but will send to the jury the question whether the traveler acts with ordinary care. Larrabee v. Sewall, supra.' "

Where the operator of a motorcycle, by a sudden emergency not caused in whole or in part by him, is placed in a position of immediate peril, without sufficient time in which to determine with certainty the best course to pursue, the precautions to take, the choice or maneuver to make in order to avoid an accident and takes a course of action other than that which might have been better, safer or more judicious, he is not necessarily negligent provided he exercised that degree of care that an ordinarily prudent person would have employed under the same or similar circumstances; the sudden emergency doctrine is not an exception to the general rule requiring ordinary care in the operation of a motor vehicle, but the emergency is one of the circumstances to be taken into consideration in determining whether he has exercised the care that a reasonably prudent person would exercise under the

same or similar circumstances. Campbell v. Jackson, supra; Kearney v. Castellotti, 55 Cal.App. 541, 203 P. 1029; Mortensen v. Fairbanks, supra; American Products Co. v. Villwock, supra; Lopez v. Wisler, supra; Reuman v. La Monica, 58 Cal.App. 2d 303, 136 P.2d 81; Emery v. Los Angeles R. Corporation, 61 Cal.App.2d 455, 143 P. 2d 112; Nicholas v. Fennell, supra; Hook v. Kirby, 175 Wash. 352, 27 P.2d 567; Southwestern Freight Lines v. Floyd, 58 Ariz. 249, 119 P.2d 120; Payne v. Prestridge, 16 La.App. 479, 133 So. 512; Van Tine v. Cornelius, 355 Pa. 584, 50 A.2d 299; French v. Utah Oil Refining Co., 117 Utah 406, 216 P.2d 1002. See also 60 C.J.S., Motor Vehicles, § 257, pp. 624–628; Id., § 368, p. 915; 38 Am.Jur., Negligence, § 41, p. 686.

Viewing the evidence in the light most favorable to Matheson, as it affects his acts and conduct from the moment he entered the intersection, the jury might well believe that he was suddenly confronted with an emergency, not created by his own antecedent negligence, which continued without interruption to the point of impact, which caused him fright, excitement and bewilderment yet required him to act suddenly without time for deliberation or reflection in selecting the safest and wisest course; that although he might have made a mistake or erred in his judgment, or failed to take some precautions, or made one or more unwise maneuvers, he nevertheless exercised that degree of care that an ordinarily prudent person would exercise under such circumstances.

Different minds might reasonably differ as to the relative position of the truck and motorcycle at the instant when Matheson was necessarily compelled to form a judgment as to what course he should pursue; such uncertainty should be submitted to the jury. There were other uncertainties confronting the jury when attention is directed to Matheson's conduct after he concluded to continue on his course forward; the jury may have concluded that a reasonably prudent person, having formed a judgment, might, under all the facts and circumstances, have pursued the course which Matheson did in an effort to enhance his chances of avoiding an accident in moving through and beyond the intersection; accepting the testimony of Matheson as true, he made some effort in that direction; reasonable minds might differ as to the time and the distance available to Matheson in which to veer to the west and accelerate his speed if he could, in order to get clear of the truck, and as to whether his failure to accomplish this objective was chargeable to the emergency under which he was acting or whether such failure was the sole or contributing cause of the ultimate collision. I point up these matters to indicate that a jury may have concluded, as it could have done under the evidence, that Matheson's acts and conduct under all the facts and circumstances were the acts of an or-

dinarily prudent man under the same or a similar situation.

The majority opinion notes that plaintiff did not attempt to pass Smith to the left as required by sec. 49–512, I.C. This is of no moment under the evidence. Such requirement of the statute has its exceptions. The driver of a motor vehicle may overtake and pass to the right of another vehicle moving in the same direction when the overtaken vehicle is making or about to make a left turn. Monroe Hardware Co. v. Monroe Transfer & W. Co., La.App., 167 So. 498; Maddox v. Brown, 232 N.C. 542, 61 S.E.2d 613; moreover, it is not negligence to go to the right of the vehicle in front if a situation of peril is presented in which to avoid a possibility of injury a reasonably prudent person might well consider such to be the more prudent course. Squier v. Davis Standard Bread Co., 181 Cal. 533, 185 P. 391; again, whether or not a driver was justified in failing to pass on the left may be a question of fact for the jury to determine. Jennings v. Bragdon, 289 Mass. 595, 194 N.E. 697; Piper v. Adams Express Co., 270 Pa. 54, 113 A. 562; Cloherty v. Griffiths, 82 Wash. 634, 144 P. 912.

From the analysis of the evidence as outlined above it is clear that with respect to many material aspects it is conflicting. This court has repeatedly held that where the evidence on material facts is conflicting or where on undisputed facts reasonable and fair minded men may differ as to the inferences and conclusions to be drawn, or where different conclusions might reasonably be reached by different minds, the question of negligence, contributory negligence and proximate cause is one of fact to be submitted to and determined by the jury and not a question of law for the trial court or for this court on appeal. Stowers v. Union Pac. R. Co., 72 Idaho 87, 237 P.2d 1041 and the cases cited therein, particularly Adkins v. Zalasky, 59 Idaho 292, 81 P.2d 1090 and Hobbs v. Union Pac. R. Co., 62 Idaho 58, 108 P.2d 841; Samuelson v. Siefer, 62 Cal.App.2d 320, 144 P.2d 879. The majority opinion has not applied this fundamental principle.

There is substantial evidence in the record which if believed by the jury, as no doubt it was, tends to support the position of Matheson. The strikingly appropriate statement made in the case of Conley v. Amalgamated Sugar Co., 74 Idaho 416, 263 P.2d 705 at page 709, is set forth as follows:

"It is not what evidence tends to support appellant, or negative that favorable to respondents, but it is what evidence tends to support respondents, with all reasonable inferences and intendments to be drawn in favor of respondents, which controls the determination of the controversy in this Court."

It should be but is not applied in the majority opinion.

There being substantial evidence to support the verdict and judgment the same should be affirmed.

GIVENS, J., concurs in this dissent.