(No. 6813. December 10, 1940.)

WILLIAM HENRY HOBBS and MARY LOUISE HOBBS, Respondents, v. UNION PACIFIC RAILROAD COMPANY and G. A. SHERWOOD, Appellants.

[108 Pac. (2d) 841.]

Rehearing denied January 13, 1941.

Geo. H. Smith, H. B. Thompson and L. H. Anderson, for Appellants.

E. H. Hillman, for Respondents.

MORGAN, J.—Shortly before 3 o'clock in the afternoon of November 12, 1938, respondents, who live on their farm four miles east of St. Anthony, together with their neighbor, Mr. Jacobson, and their son, Merlin, twenty-two years old, drove to St. Anthony in their automobile to which was attached a four-wheeled trailer loaded with wheat. The wheat was being taken to St. Anthony to be sold. After reaching

St. Anthony they started north along a street which crosses the tracks of appellant Union Pacific Railroad Company. In attempting to cross the tracks the automobile collided with the motor car of a two-car train belonging to the railroad company. The motor car was operated by appellant Sherwood, as engineer. The collision resulted in the death of Merlin Hobbs and in personal injuries to respondents. This action was commenced to recover damages for the death of respondents' son (who was not married and who lived with them and helped them on their farm), and for personal injuries to themselves. Three causes of action were stated in the complaint: The first for the death of the son; the second for injuries sustained by the husband, and the third for injuries sustained by the wife. Trial resulted in a verdict and judgment in favor of respondents on all causes of action. Appellants moved for an order setting aside the verdict and for a judgment in their favor notwithstanding the verdict, or, in lieu thereof, that a new trial be granted. The motion was overruled and the case is here on appeal from the judgment and from the order overruling the motion.

Respondents rely on alleged negligence of appellants in the operation of the train as the proximate cause of the accident. Appellants insist they were not negligent and rely on alleged contributory negligence of respondents and their son in the operation of the automobile. Appellants have specified twenty-one assignments of error and have grouped them, in their brief of argument, under five heads, to wit: 1. Alleged negligence of appellants; 2. Alleged contributory negligence of respondents and their son, the driver of the automobile; 3. Error in admission of evidence; 4. Error in instructions given; 5. Error in refusing to give certain instructions requested by appellants.

Appellants moved for a nonsuit, and have assigned as error the action of the court in overruling it, on the ground that no negligence on appellants' part was established which was the proximate cause of the collision; also that the evidence established that Merlin Hobbs and respondents were guilty of contributory negligence as a matter of law. They have also assigned as error the overruling of their motion for a directed verdict, and the overruling of their motion for judg-

ment notwithstanding the verdict, or for a new trial. The latter assignments are based on the ground that the evidence introduced by both parties failed to show negligence on appellants' part which was the proximate cause of the collision; also that the evidence established that Merlin Hobbs and respondents were guilty of contributory negligence as a matter of law.

In *Manion v. Waybright*, 59 Ida. 643, 655, 86 Pac. (2d) 181, 186, we had under consideration a motion for nonsuit, a motion for directed verdict and a motion for judgment notwithstanding the verdict and announced a rule applicable to this phase of the present case, as follows:

"The same rule of law applies to each of these motions. In each case, the party making the motion admits the truth of his adversary's evidence, and his adversary is entitled to the benefit of every inference favorable to him which may be drawn legitimately from any evidence before the court at the time the motion is made. (*Hobson v. Security State Bank*, 56 Ida. 601, 57 Pac. (2d) 685.)"

I. C. A., section 60–412, is relied on by respondents. It is as follows:

"A bell of at least twenty pounds weight must be placed on each locomotive engine, and be rung at a distance of at least eighty rods from the place where the railroad crosses any street, road or highway, and be kept ringing until it has crossed such street, road or highway; or an adequate steam, air, electric or other similar whistle must be attached, and be sounded, except in cities, at the like distance, and be kept sounding at intervals until it has crossed the same, under a penalty of $100.00 for every neglect, to be paid by the corporation operating the railroad, which may be recovered in an action prosecuted by the prosecuting attorney of the proper county, for the use of the state. The corporation is also liable for all damages sustained by any person, and caused by its locomotives, trains or cars, when the provisions of this section are not complied with."

Failure to conform to this statute constitutes negligence *per se*. (*Wheeler v. Oregon R. R. etc. Co.*, 16 Ida. 375, 102 Pac. 347; *Fleenor v. Oregon Short Line R. R. Co.*, 16 Ida. 781, 102 Pac. 897; *Graves v. Northern Pac. Ry. Co.*, 30 Ida.

542, 166 Pac. 571; *Curoe v. Spokane etc. R. R. Co.*, 32 Ida. 643, 186 Pac. 1101; *Smith v. Oregon Short Line R. R. Co.*, 32 Ida. 695, 187 Pac. 539; *Carron v. Guido*, 54 Ida. 494, 33 Pac. (2d) 345; *Allan v. Oregon Short Line R. Co.*, 60 Ida. 267, 90 Pac. (2d) 707.)

To support an allegation in their complaint that no signal was given, as required by law, of the approach of the train to the crossing, respondents testified to having listened, carefully, for the sound of a whistle or bell, just before the collision, and heard none. They produced a witness who was a passenger on the train, riding in the motor car, and he testified he heard neither whistle nor bell as the train approached the crossing. Appellants produced a number of witnesses, some who were on the train and some who were not, who testified to having heard the whistle, or bell, or both, as the train approached the crossing.

 ·While a majority of the witnesses who testified on this point stated they heard the whistle, or bell, or both, it cannot be said, truthfully, substantial evidence that neither of these signals was given does not appear in the record. The testimony of witnesses to the effect that they were in position to hear the signals and did not hear them, opposed to that of witnesses who testified they heard them, presents a conflict in the evidence, and a question for the jury. This state of the record would not support a nonsuit, an instruction directing a verdict, an order for judgment for defendants notwithstanding a verdict for plaintiffs, nor a reversal of the judgment on appeal.

 In *Claris v. Oregon Short Line R. R. Co.*, 54 Ida. 568, 573, 33 Pac. (2d) 348, 349, we said:

"The rule, we think, is that in a motion for nonsuit or directed verdict the evidence must be construed in the light most favorable to plaintiff. It is only where there is an entire absence of testimony tending to establish the case that a nonsuit may be properly ordered or a directed verdict granted. Where the question depends on a state of facts from which different minds may honestly draw different conclusions on that issue the question must be submitted to the jury for determination. Where facts are disputed or in-

ferences therefrom are reasonably disputable, the question is one for the jury.'' (Many authorities cited.)

(See, also, *Evans v. Davidson*, 58 Ida. 600, 613, 77 Pac. (2d) 661, 667; *Allan v. Oregon Short Line R. Co.*, 60 Ida. 267, 273, 90 Pac. (2d) 707, 709.)

Appellants and respondents all rely on ordinance No. 292 of the city of St. Anthony, which prohibits the running of railroad trains within the city limits at a speed in excess of twenty-five miles per hour, and provides:

''it shall be unlawful for any person to drive any vehicle . . . . upon or across any railroad track, within the city limits of St. Anthony, without first bringing such vehicle to a full stop within not less than ten feet and not more than fifty feet of . . . . such railroad track.''

The evidence as to the speed of the train as it approached the crossing is conflicting. That introduced on behalf of appellants is to the effect that it was about twenty miles per hour. Evidence introduced on behalf of respondents, in addition to the testimony of the expert, hereinafter discussed, would justify the conclusion that it was running between twenty-five and thirty-five miles per hour. The rule of law last above quoted applies to this conflict in the evidence.

Appellants insist respondents and their son were guilty of contributory negligence in that they permitted him to drive, and he drove the automobile against the motor car of the train without stopping not less than ten feet nor more than fifty feet from the track; also, that they were guilty of contributory negligence in failing to look carefully for the train and listen for its approach, and that had they done so, and heeded what they would have seen and heard, the collision would not have occurred.

The evidence shows it was necessary for the automobile, in traveling northward along the street toward the elevator where the wheat was to be delivered, to cross two tracks of appellant railroad company before reaching the track on which the train was approaching from the east. These tracks and the one on which the train was approaching are shown on a map introduced in evidence. The southerly track, the one first crossed by the automobile, is marked on the map ''Miller Bros.' Track''; the second, or middle track, is marked

"House Track," and the third, the one on which the train was approaching the crossing from the east, is marked "Main Track." Immediately east of the street and twenty-four feet south of Miller Bros.' Track is a building belonging to Associated Seed Company. Immediately west of the street and close to the south rail of Miller Bros.' Track a coal shed is shown on the map, but we do not find it mentioned in the testimony.

Van Clark who was, at the time of the accident, sheriff of Fremont County, of which St. Anthony is county seat, testified, from measurements made by him, that from the south rail of Miller Bros.' Track to the south rail of House Track is eighteen feet and from the south rail of House Track to south rail of Main Track is fifteen feet. That makes a total of thirty-three feet from the first rail the automobile crossed to the south rail of the track on which the train was approaching. Two box cars, each forty feet long, stood on Miller Bros.' Track immediately east of the east line of the street. Mr. Clark also testified to certain tracks and ruts in the street, showing where it had been traveled and that from the right-hand wheel-track going north, it was eleven feet to the end of the draw bar on the box car standing nearest the street. He further testified:

"Q. Mr. Clark, a driver in approaching from that direction would have a vision between the box cars and the seed house of a portion of the main line track?

"A. Yes, he would have on ordinary occasions, on good clear occasions; but this particular day he didn't have.

"Q. Now, why do you say he didn't have on this particular day?

"A. It was snowing quite a little bit, and the snow was dry and cold; and the seed house on the driver's right has a large roof area, the roof covers quite a little bit; and the snow would fall on that roof, and the wind would whip it off and whirl it in behind the warehouse, between the warehouse and the box cars, so it would make it pretty hard to look through.

"Q. From your observation, state whether or not that would have tended to obscure the view of one approaching the crossing from the south?

" . . . .

"A. Well, it would be about the same condition as to—as compared with a fog; if you stand and observe and look closely you will be able to see through it, but not plain, or as easy as you would on a clear sunshiny day."

The railroad tracks at the point of the collision and on each side of it are laid in a broad curve.

Mr. Clark further testified:

"Q. Did you have occasion, Mr. Clark—or, did you make observation of the distance you could see east on the railroad track, at the point where you would first emerge from behind the box cars—or, rather, at the box cars; did you make any observation at that point?

"A. Yes, I made an exact measurement of that.

"Q. Just tell the jury what occurred, what your observation was there, in distance.

"A. Well, my son walked up the railroad track—I stood on the track where the box cars were, and had my son walk up the track, and I used the two box cars as a straight edge, and he walked up the track until he went behind those box cars; and then I had him stand back in view, just the width of his body, and make a mark in the snow; and then we measured from the wheel track up the rail—or in the middle of the track, I don't know which—to where he made his mark where he was standing.

"Q. And that measurement was taken, was it, on the main line?

"A. Yes sir.

"Q. And how far, how many feet was that?

"A. A hundred and twenty feet.

"Q. Then, after emerging from—or, as you would emerge from behind the box cars, your first view would be only a hundred and twenty feet; is that right?

"A. That's right."

Appellants introduced evidence tending to show the automobile did not stop as it approached the crossing. Both respondents were rendered unconscious by the collision. Neither was able to remember the collision or anything relating to it which occurred after their automobile passed behind the box car. The husband suffered a lapse of memory for a period of about two weeks after the accident. Respond-

ents testified the automobile was stopped a short distance before the box cars were reached. Neither of them was able to fix the distance exactly. On that point the husband's testimony is somewhat confused. The part of it most favorable to the theory that the automobile was stopped not less than ten feet nor more than fifty feet from the railroad appears in his cross-examination, as follows:

"Q. And what did you—what did you do when you stopped back from the track a ways; did you stop there and discuss where you would take the wheat; was that the purpose of stopping?

"A. The reason he stopped was he thought maybe that I would want him to go around to Miller Brothers. He had plenty of room to swing around to Miller Brothers there, but if he had went a little bit farther he couldn't have turned.

"Q. Miller Brothers would be over to the left of you as you came up that street?

"A. Yes.

"Q. And to turn into Miller Brothers you would have to be back from the track a little ways?

"A. Yes.

"Q. Do you know about how?

"A. Oh, you turn within a hundred feet, or maybe fifty feet of the track.

"Q. Just where you stopped, though, you don't know for sure; is that right?

"A. Well, I—all I can remember is we passed that alley that goes between the warehouse and the seed house. I know there's a warehouse there and the seed house.

"Q. Uh huh.

"A. We had passed that and he had stopped the car.

"Q. I see. Then you discussed then where you were going to take the seed, or the wheat?

"A. Yes.

"Q. And when you stopped there, you were back far enough so that if you had looked for the train you couldn't have seen it for the seed house; is that correct?

"A. Couldn't have seen it for the seed house and them cars.

"Q. But you didn't look at that place, did you?

"A. Huh?

"Q. Did you look at that place, where you stopped?

"A. Yes, I looked. There was only an opening—oh, I should judge it would have been twenty feet, that you could see between the seed house and the cars.

"Q. Uh huh.

"A. Just a little narrow channel."

As heretofore pointed out, the distance between the seed house and the track on which the cars stood is twenty-four feet. That testimony, if believed by the jury, would justify it in deciding the automobile was stopped not less than ten feet nor more than fifty feet from the railroad track, and that respondents and their son were not guilty of violating the city ordinance.

Mrs. Hobbs, who was riding in the front seat of the automobile with her son, testified he and she both looked between the seed house and the box cars and that she did not see the train. After the son, the driver of the automobile, passed the box cars, had he looked east, immediately, he could have seen the approaching train if it was within a hundred twenty feet of the crossing.

Can it be said, as a matter of law, that if he had acted as a reasonably prudent person would have done under the circumstances, he would have seen the approaching train and avoided the collision by stopping or by turning the automobile either to the right or left? It was his duty to look for and avoid pedestrians and vehicular traffic, and to look to the west as well as to the east for approaching trains. To what extent his view of the railroad tracks to the west was obstructed by Miller Bros.' coal shed does not appear from the record for, as heretofore mentioned, the presence of the shed near the track and to the west of the street is shown only by the map in evidence. However, the jury viewed the premises, pursuant to direction by the trial judge, and the extent of the obstruction, if any, of the view of the tracks to the west, caused by the coal shed, must have been apparent to it.

The occupants of the automobile having looked between the seed house and the box cars to assure themselves there was no train approaching from the east, which could be

seen from that position, it was for the jury to say whether they were guilty of negligence in proceeding past the box cars toward the main line. Neither respondent has any recollection of what occurred immediately after the box cars were passed, and their son is dead. Mr. Jacobson was not presented as a witness and the reason for his not testifying does not appear in the record.

The thirty-three feet between the south rail of Miller Bros.' Track and the south rail of Main Track is not the distance which was available to the driver of the automobile in order to avoid a collision. From that distance must be deducted the width of the box cars which stood on Miller Bros.' Track. The record shows the front of the automobile and the left front corner of the motor car were the points of contact in the collision, so the length of the portion of the automobile in front of the driver's point of vision to the eastward must also be deducted, as must the width of the portion of the motor car which extended outside the south rail on the Main Track. The number of feet which should be deducted from the distance between the south rail of Miller Bros.' Track and the south rail of Main Track, traveling which the driver of the automobile had an opportunity to see the oncoming train before the collision, is not made clear by the record, but it seems reasonably safe to assume that when he had passed the box cars, so as to be able to see the approaching train, the front of the automobile was within less than twenty feet of the south rail of Main Track.

Lavon Sorenson, a witness called by appellants, testified on cross-examination:

''Q. Now, this roadway that you spoke of, where you think it might be possible to turn up between the first and second track, that would extend the front end of his car so far that it would be a little difficult then to turn, wouldn't it; that is, after he had reached that position? Do you understand what I mean?

''A. There was a little bit, but I think I could have done it.

''Q. You think you could have done it. But, of course, ordinarily, if you were going to turn there, had intended to turn before you got there, you would have probably commenced to turn on the planking, would you not, rather than

wait until you got beyond the box cars and then turned; that would be the normal way to turn, if you had been approaching from the south and when you reached the first track decided you would turn between the two, wouldn't it?

"A. That would all depend on whether or not I was scared.

"Q. Depending on whether or not you intended to turn there at the time. But, after you got on there, just emerging from behind the box cars, and suddenly saw a train about fifteen or twenty feet away, then you wouldn't be sure just what you would do, would you?

"A. No sir.

"Q. It's hard to tell what a man would do under those circumstances, isn't it?

"A. (No answer.)

"Q. So, when you are speaking of thinking about turning there, you say it would have been possible to turn, and you think you could have turned there, and that's correct?

"A. Yes.

"Q. But, what you would have done under the circumstances those people were under, that's another question, isn't it?

"A. Oh, yes.

"Q. That's altogether different?

"A. Yes sir."

The duty does not devolve on appellate courts to decide, from such testimony as that before us, what a reasonably prudent person would have done under the circumstances. What we said in *Adkins v. Zalasky*, 59 Ida. 292, 299, 81 Pac. (2d) 1090, 1093, is applicable here. We repeat:

"One reason for the rule that the existence of negligence, or contributory negligence, is not generally a question for the judge is that a jury is composed of members of various ages, occupations and experiences, and is in better position to determine what a reasonably prudent person would do, under stated circumstances, than is a trial judge or an appellate court. It is well known that some people react more quickly, and more intelligently, to impending danger than do others; that old people are apt to be more cautious than are young people, and that human judgments are as diver-

sified as are human beings. Therefore, the best way to get a just determination, as to whether a man or woman acted 'as a reasonably prudent person would have acted under like circumstances,' is to submit the question to a jury, and get the benefit of the combined opinions of twelve persons on it. It is only when there can be but one possible answer, reasonably made, to that question that a trial judge, or an appellate court, should assume to decide it. It is a human weakness for one to say, when considering the conduct of others, 'I would not have done that,' or 'I would have done this,' and to say it in such a way as to indicate that what he would have, or would not have done settles the proper procedure for all mankind. The method of deciding disputed facts, or of drawing just conclusions from those not in dispute, by submitting the question to a jury, composed of individuals of various walks of life, ages and experiences, is the best known means of establishing the facts which, in the administration of justice, must form the basis of a judgment.''

In *Department of Finance of State v. Union Pac. R. Co.,* 61 Ida. 484, 499, 104 Pac. (2d) 1110, 1116, we said:

''The question of contributory negligence is for the jury, and never one of law, unless the facts alleged in the complaint or proven are reasonably susceptible of no other interpretation than that the conduct of the injured party caused, or contributed to, his injury, and that, because of his negligence and carelessness, he did not act as a reasonably prudent person would have acted under like circumstances. *Adkins v. Zalasky,* 59 Ida. 292, 81 Pac. (2d) 1090; *Allan v. Oregon Short Line R. Co.,* 60 Ida. 267, 90 Pac. (2d) 707; *Smith v. Oregon Short Line R. R. Co.,* 32 Ida. 695, 187 Pac. 539; *Fleenor v. Oregon Short Line R. R. Co.,* 16 Ida. 781, 102 Pac. 897.''

Van Clark testified he was a fireman on the Great Northern Railroad from May 4, 1912, until some time in August, 1915; that frequently he had seen the emergency brakes applied; that from his experience he was able to approximate the distance the train should have traveled after applying the brakes in emergency when going at the rate of about twenty miles an hour; that the trains he worked on were

drawn by locomotive steam engines and were equipped with air brakes. He was asked:

"Q. Now, from having observed the point where the train finally stopped, what would be your estimate of the speed it was traveling, at the time of the collision?"

The question was objected to "on the ground that the witness clearly is not qualified to answer or to express any opinion; and no proper foundation has been laid." The objection was overruled, and the witness answered:

"Well, it was possible it was traveling thirty-five miles an hour."

██ ██ Mr. Clark's experience as a railroad fireman was sufficient to enable him to form an opinion, which would probably be of value to the jury, as to the distance in which such a train as that involved in the accident should have been stopped, by the application of emergency brakes, in good working order, by a competent engineer. Whether or not a witness is qualified to testify as an expert is largely in the discretion of the trial judge. (*Carscallen v. Coeur d'Alene etc. Co.*, 15 Ida. 444, 98 Pac. 622; *Austin v. Brown Brothers Co.*, 30 Ida. 167, 164 Pac. 95; *Hard v. Spokane International Ry. Co.*, 41 Ida. 285, 238 Pac. 891; *Thibadeau v. Clarinda Copper Min. Co.*, 47 Ida. 119, 272 Pac. 254; *McMahon v. Rothwell*, 51 Ida. 277, 5 Pac. (2d) 82; 20 Am. Jur. 657, sec. 783.)

██ For the witness to form an opinion with respect to the speed at which the train was traveling, at the time of the collision, it was necessary that he have other facts than the distance it traveled after the collision on which to base it.

██ The record shows Mr. Clark did not reach the scene of the accident until fifteen or twenty minutes after it occurred. When he arrived the train was standing some distance from the crossing. It is clear from the record the train had not been moved from the time it first stopped until after the arrival of Mr. Clark, but it is not clear he was in the court room when testimony on that point was given. Appellant, Sherwood, had been called by respondents for cross-examination, pursuant to our statute providing for that procedure, prior to the calling of Clark as a witness, and the record shows Clark was in the court room when Sherwood

was on the witness stand, but does not show whether he was present when the latter's testimony was given that the brakes were in good working order; that he applied them in emergency as soon as he saw the automobile, when he was about seventy feet from the crossing, and that he did everything in his power to avoid the collision. These facts, as well as the fact that the train remained standing where it first stopped, until after his arrival, were necessary, in addition to his observation of the point where it stood, to constitute a foundation for his opinion as to the speed it was traveling at the time of the collision.

The objection that "no proper foundation has been laid," was not sufficiently specific. It should have been stated wherein the foundation for the opinion was insufficient. The only reason assigned in the objection that no proper foundation had been laid was "that the witness clearly is not qualified to answer or express any opinion". As heretofore pointed out, the qualifications of the witness were sufficient to enable him to form an opinion which would probably be of value to the jury. It was not an abuse of the trial court's discretion to overrule the objection so far as that ground was concerned. If counsel desired to object on the ground that it was not shown the witness knew whether the train had been moved after it first came to a stop following the collision, or that he knew when the brakes were applied, or how they were applied, or whether or not they were in good working order, they should have so specified in their objection. In *Hayhurst v. Boyd Hospital*, 43 Ida. 661, 671, 254 Pac. 528, 530, we said:

"It is also urged that the court erred in overruling defendant's objections to hypothetical questions, upon the ground that they did not fairly reflect the facts in evidence. Counsel's objections were not sufficient to raise the question, since they did not point out wherein the facts assumed did not properly reflect the facts proven, or incorporated facts not proven. (*Pennington v. Kansas City R. Co.*, 201 Mo. App. 483, 213 S. W. 137; *Knutson v. Moe Bros.*, 72 Wash. 290, 130 Pac. 347; *Quaker Oats Co. v. Grice*, 195 Fed. 441.) 'There should be no masked batteries in the trial of a lawsuit. All matters should be uncovered in a manner that

the court and counsel and jury may see and understand all questions presented for determination. No court can intelligently rule upon a question without it understands that question.' (*Kinlen v. Metropolitan Street Ry.*, 216 Mo. 145, 115 S. W. 523, 533.)''

The ruling on the objection does not constitute reversible error.

We have examined the instructions given and those requested by appellants and refused. We find no error, prejudicial to appellants, in the action of the court with respect to instructions.

The judgment and order denying a new trial are affirmed. Costs are awarded to respondents.

Ailshie, C. J., and Holden, J., concur.

Budge and Givens, JJ., dissent.