**BOISE PAYETTE LUMBER CO.**

v.

**LARSEN et al.**

**No. 13478.**

United States Court of Appeals, Ninth Circuit.

June 18, 1954.

■

Milton E. Zener, Ben Peterson, Pocatello, Idaho, for appellant.

B. W. Davis, Louis F. Racine, Jr., Pocatello, Idaho, Frank A. Bruno, H. D. Reed, Denver, Colo., for appellees.

Before HEALY, ORR and CHAMBERS, Circuit Judges.

CHAMBERS, Circuit Judge.

Wayne Larsen, Sr., 33, and three others met their deaths in the crash of a privately owned airplane near Phillips Field, adjacent to Pocatello, Idaho, on the night of July 17–18, 1950. The owner of the aircraft, Homer G. Smith, and passengers, Orville Berry and Lawrence Bert Larsen, father of Wayne Larsen, Sr., were the other occupants. No witness has been produced who saw the actual crash. The party of four had gone to Twin Falls, Idaho, late on the afternoon of July 17 in the same aircraft to witness a night baseball game. Twin Falls is some 120 miles from Pocatello. A safe landing at Pocatello was all that was required to complete their trip, the return portion of which was made on a dark night.

Larsen was survived by a wife and an afterborn son, Wayne Larsen, Jr. This claim in negligence was brought by his wife, Helen Joye Larsen, individually and as next friend of the infant son. Mrs. Larsen is the appellee here. The appellant-defendant is the Boise Payette Lumber Company, employer of the deceased owner of the plane, Homer G. Smith. A jury in the district court in Idaho awarded the plaintiff the sum of $75,000. Homer G. Smith, owner of the plane, was a salesman-estimator of the defendant company. He seems to have been rather aggressive, and entertainment of his prospects at company expense was one of the means by which he obtained and kept business. The two Larsens and Berry were associated together in a family business and were customers of the appellant.

Jurisdiction rests on the citizenship of the widow in Idaho and the incorporation of the Boise Payette Lumber Company in Delaware.

The defendant-appellant brings the case here with a number of contentions which are the basis of appropriate assignments of error.

The propositions of Boise Payette for a reversal of the judgment against it entered upon the verdict may be summarized as follows:

1. The salesman, Homer G. Smith, if authorized to take the trip as company business, was not authorized to use his personal plane in doing so.

2. The deceased, Wayne Larsen, Sr., assumed the risk of the flight.

3. Larsen was guilty of contributory negligence.

4. For aught that anyone knows, Larsen, not Smith, may have been flying the aircraft. (Larsen had had some previous flight training and experience.)

5. The damages of $75,000 awarded are so excessive that they must have been awarded under passion and prejudice.

6. Some instructions were erroneous.

■ This court has carefully considered the evidence and the authorities with respect to whether or not the now deceased owner of the plane, Homer G. Smith, in using his own plane for the trip was using a mode of conveyance authorized by the company. Much of the appellant's effort in the case is devoted to this proposition. Undoubtedly, Boise Payette has a deep seated belief, shared by its attorneys, that the use of the aircraft by salesman Smith was never authorized by the company. However, the record, taken in its most favorable light for the prevailing plaintiff, as it must be, seems to be against Boise Payette on the point.

Mr. Frank M. Lacy, district manager of Boise Payette, was examined as an officer of an adverse party. Lacy was a man of some authority in the company and talked to Homer Smith on the telephone shortly before the takeoff from Pocatello. There had been some doubt about whether Smith could entertain his customers, the Larsens and Berry, on the ill-fated evening because of an impending conference at Pocatello of Smith, Lacy and J. L. Jeremiasen, vice president and general manager of the retail division of Boise Payette, which had several yards in Idaho. In this conversation, said Lacy from the stand, Smith informed him of his intention to take the customers to the ball game. Parenthetically, this question and answer went into the record:

"Q. (By Mr. Davis) I thought you said that you had supervision to tell him [Smith] to meet with you and Jeremiasen. A. (By Mr. Lacy) That word supervision—we work as a family, we don't say you have to do this or that."

The foregoing might indicate that Smith may not have been closely circumscribed as to what inexpensive mode he would use in entertaining customers. Then Lacy relates, with respect to the aforementioned telephone conversation:

"He [Smith] said, 'Inasmuch as there is some uncertainty about Mr. Jeremiasen coming, I believe we will go to the ball game'; he said that Mr. Berry and Larsen had been planning on driving, and some suggestion was made about flying, and 'I believe I will fly them down.'"

Lacy, as of the time, knew that the Larsens and Berry were customers of Boise Payette and that Smith was authorized to entertain customers. Also, Lacy says he had the authority to permit Smith to fly. But he says he didn't authorize Smith to fly.

Need one put in writing authority to use an airplane for entertainment of business customers, or must one expressly say, "I authorize you to use your airplane."? Under the circumstances, when Lacy knew of Smith's plans for the evening, the jury, within its proper function, may have thought there was a duty on the part of Lacy to speak, if he disapproved. If Smith didn't have the general authority to use his plane for the trip, surely the jury could have found implied approval by Lacy.

■ As the court views the evidence, the jury was entitled to find that at least one of the officers of the company with executive authority impliedly consented to the use of the particular instrumentality for the specific trip that resulted in so much tragedy. Also, while it is deemed unnecessary to decide the point, unless we were to hold that the use of a private airplane is the use of a particularly dangerous instrumentality—and we do not so hold—the use of the airplane may well have been within the authority of a salesman who was assigned to get new business, keep old business and regain some of the lost business and to do some entertaining to do it.[1] The situation would be much different if a truck driver of Boise Payette had been assigned to take a load of lumber from Pocatello to Twin Falls and bring back a load of cement. In such a case, without more, an inference might not be permissible that a truck driver was authorized to deviate from his regularly traveled route or to use an airplane to do the job. There would seem to be no indication that Smith had been instructed in any way in the choice of modest forms of entertainment.

Restatement of Law of Agency, §§ 32, 34, 35, 43(1).

[1]. A much finer question of law is presented where the act of the agent is within the scope of the employment of the agent but was performed in disobedience of particular orders of the principal. See Department of Water and Power v. Anderson, 9 Cir., 95 F.2d 577. The opinion in the principal case is written assuming, arguendo, that plaintiff had to show that the use of Smith's plane was authorized by Boise Payette.

*Who was at the controls of the plane?*

Boise Payette earnestly contends that there was a failure of proof that its employee (Smith) was flying the plane. The aircraft was a Cessna 170 with dual controls. The plane could be operated from the position of either set of controls. The decedent is shown to have had some previous flight training and experience. It is suggested, in view of his past record, that on the ill-fated night, for all anybody knows, Larsen may have been at the controls. It is possible that he was. If we had a case of equal inferences—absolutely or approximately equal inferences—then to permit a recovery by the decedent's widow would be a miscarriage.

As stated above, no one saw the actual crash. But, on the evening of the accident, one Charles B. Hughes was officially on duty at the control tower at Phillips Field, Pocatello. As the Smith plane came in Hughes was in touch with it by radio. The voice in the plane which asked for clearance is sufficiently identified as that of Smith. Hughes gave landing instructions. On the turn preceding the contemplated approach, the voice on the radio from the plane advised the tower that the plane would pass over the field. A moment later, the craft having passed over the field, the voice from the plane reported "turning base leg" and the ship again was cleared over the radio by the tower to land. The clearance was acknowledged by the voice in the plane. Then the tower lost contact with the plane. It seems not to be disputed that the crash happened immediately after the tower lost radio contact.

██ In the direction of the crash, the tower controller could not see the plane or the crash. His vision was obscured by a post in the tower. It is not suggested that more than one voice was heard from the plane. There is little reason to doubt that in the plane Smith did all the talking. But was Smith flying the plane? It is not a mathematical certainty, but the conclusion that he was flying the plane was within jury limits. The jurymen could consider from their human experience whether, when Smith owned the plane, was doing the talking on the radio on the request for clearance, on the turn over the field and on turning the base leg, it was probable that he had turned the controls over to another who had not flown for some months. By itself it probably would not have been enough, but with all the other evidence on the issue of who was flying the plane, the jury was entitled to consider the fact that the decedent had "sworn off" flying the previous year.

In big, complex airplanes, there is a division of labor, almost everyone knows. But in a small aircraft with the owner aboard, may the jury not assume when the owner was doing the talking to the control tower that the owner had the reins in his hands? Wouldn't it have been permissible in horse and buggy days, if the owner, on a dark night, were heard giving instructions to the horse, to assume that he had the reins in his hands?

Good evidence that Smith was at the controls is that the voice, while over the field, said *he* "would pass over the field." If Larsen were at the controls and Smith doing the talking, would Smith have said that he, Smith, would pass over the field?

At best, for Boise Payette, it was a question of fact for the jury to decide who was at the controls.

*Causation*

The question of causation is raised by Boise Payette. It says there was no proof of causation. At the time of the crash the weather was clear and the temperature was 64 degrees. There was negligible wind, but the night was dark. The runway lights and contact lights of the field were lighted.

Smith had had no nighttime or instrument training. The evidence would seem to indicate that the engine was performing satisfactorily while the plane was in contact with the tower.

Without objection, the official government report on the accident came into

evidence (Form 453). That report states that from the examination of the wreckage "it could be ascertained there was no aircraft or engine malfunction." To the untrained, it is to wonder how an investigator poking through the rubble of a cracked up plane can say there was no engine malfunction. But maybe the trained inspector can. Bratt v. Western Air Lines, Inc., 10 Cir., 155 F.2d 850, 166 A.L.R. 1061.

Also, the same report said the aircraft struck the earth at a fairly steep angle with left wing low. The report concluded that the pilot lost control at about the time the plane was turning to base leg.

What did cause the accident? A reasonable thing to conclude, under the circumstances, is that the accident occurred from a human failure of the pilot. This human failure would admit of two possibilities:

(1) The pilot was negligent at the moment in question; that is, he didn't do the best he knew how.

(2) The pilot may have done the best he knew how at the time, but because of lack of knowledge through training he handled himself, and consequently the plane, badly.[2]

The official reports and the experts who testified point to the latter suggestion. Particularly, the experts say, all the known facts indicate that, because of lack of nighttime flying experience and instruction, the pilot, on his turn to base leg, became confused and lost the horizon, or, more correctly stated for the dark night in question, lost his sense of where the horizon ought to be if there had been one, and so the crash resulted.

It is probably a short cut to say, as the experts said, "Lack of nighttime flight training caused the accident."

If one goes the long way around, one may say that if a person creates a situation through lack of requisite skill (but being just as careful as one knows how) which causes an injury, the law treats that person the same as if the situation, with the same injuries, had been brought about by a skilled person's being momentarily careless.

The popular "lack of training caused the accident" would be complete if one said, "Lack of training created a situation which caused the accident," and the legal penalty is the same as it is for the one with requisite skill not being ordinarily careful. 60 C.J.S., Motor Vehicles, § 264, page 644.

■ The decedent was a business invitee. As such, in the absence of knowledge to the contrary, he was entitled to assume that the invitor had the requisite knowledge and skill to operate whatever ordinary conveyance the invitor proposes to drive, guide or pilot.

■■ On the record, the court believes the case was one for the jury on negligence and causation. On these issues, it was open to the jury to find, as it was on most of the issues, for the defendant. But it did not. Bruce v. O'Neal Flying Service, Inc., 231 N.C. 181, 56 S.E.2d 560, 12 A.L.R.2d 647; Id., 234 N.C. 79, 66 S.E.2d 312.

*Contributory negligence and assumption of risk.*

■■ In Idaho, the trial court may take a cause from the jury in a proper case when it finds as a matter of law assumption of risk or contributory negligence by plaintiff. In a death case the same elements are a burden for the survivors who sue. Hobbs v. Union Pacific R. Co., 62 Idaho 58, 108 P.2d 841.

Boise Payette says a verdict should have been instructed in its favor be-

---

2. On the return flight, if the jury found Smith was at the controls, there was a definite violation of the Federal Civil Air Regulations requiring one carrying passengers to have made at least five takeoffs and landings within the preceding ninety days. Sec. 43.68(b) of the Civil Air Regulations. For the applicability of the regulations, Idaho Code, 1947 Edition, §§ 21–112.

cause these elements were conclusively established as defenses.

Probably forty years ago there would have been much validity to an argument that one who went up in an airplane took his own life in his hands, assumed the risk and was guilty of contributory negligence if anything happened. Cases which attribute "assumption of risk" to parties who fly in any standard plane in good mechanical order at the time with a licensed pilot (without more) are out of date. United States v. Kesinger, 10 Cir., 190 F.2d 529.

But this court upholds the verdict upon the evidence that the reason for the accident was basically Smith's lack of nighttime flying experience. Didn't the Larsens and Berry assume that risk when they consented to fly with Smith? They certainly did if they *knew* about his lack of nighttime experience and understood its significance. But Mrs. Larsen testified that her husband hadn't known Homer Smith prior to the day of the accident. There was no direct evidence of knowledge by Larsen. The burden of these two issues was upon the defendant. On the record, this court cannot say that either defense was proved beyond a jury question.

Appellant takes exception to the size of the verdict, in the amount of $75,000. Plaintiff testified that her husband's earnings were between $5,000 and $6,000 a year; that her husband was making $450 per month. The burden of a portion of appellant's argument seems to be that the appellee should have given evidence of the decedent's earnings over some considerable years and evidence that there was some probability his employment was apt to be stable. Plaintiff was on the stand and subject to cross-examination. If $5,400 a year was an unusual amount for decedent Larsen to be earning, or his employment was seasonal, or there was no prospect of continuance upon the job or his ability to get another job as good, these were matters that could have been gone into on cross-examination. Also, the defendant might have brought independent evidence as to the stability or instability of Mr. Larsen's employment. As it was, without more, the jury was entitled to assume that the decedent was a $450 a month man and take that factor into consideration, among other factors, in assessing the damages of Mrs. Larsen and the infant.

The defendant makes other arguments concerning the size of the verdict, which propositions might have been within the range of the trial judge's discretion to consider on a motion for a new trial.

Of course, the damages were not alone to Mrs. Larsen, but also to the child. Naturally, the damages to Mrs. Larsen and to the child are greater than her damages alone. Mrs. Larsen sued in her own right and as next friend of the afterborn son, Wayne Larsen, Jr. The complaint does not separately state the damages to Mrs. Larsen individually or to the minor from the death of Larsen. This court assumes that if the defendant had requested that the complaint separately state the damages to each or had requested that the verdict separately state damages to each, the district court would have required that such be done. In the absence of such request anywhere during the journey of the case through the district court, this court cannot now, on its own motion, object to the failure to separate or remonstrate with the trial court for not doing so.

The testimony shows that the decedent was generally sober and industrious, that he was in good health and that his death was a heavy loss to the wife and to the afterborn son, not only from a financial standpoint but from the aspect of his society, which seems to be compensable in Idaho. Idaho Code, 1947 Ed., § 5–311. A motion was made for a new trial, and among the grounds therefor was the one that the verdict is excessive and appeared to have been given under the influence

**380**

of passion or prejudice and that the verdict bears no reasonable relation to the amount of damages sustained. The trial court does have a wide latitude in granting a motion for new trial, and had the trial court granted such a motion upon the ground that it thought the verdict high, it might have been within its range of authority. That question is not here for decision.

■■■ It is the opinion of this court, while $75,000 is quite a lot of money, that a verdict for such an amount here is not monstrous, shocking or outrageous. Cf. Southern Pacific Co. v. Guthrie, 9 Cir., 186 F.2d 926. This court, in a recent case, Baldwin v. Warwick, 9 Cir., 213 F.2d 485, has assumed to interfere with a verdict of $50,000 in punitive damages where two gamblers, upon the verdict of a jury, must have been found to have given their victim a bad weekend from drugged drinks. Yet the Baldwin case is not authority to meddle in a wrongful death case where the life of a young, industrious, intelligent, reasonably successful young man has been taken from his dependents.

■■■ As to the instructions to the jury, the court has examined each of appellant's objections thereto. If the instructions were considered separately, fault might be found with some. But taken as a whole, as they must be, the court finds that the instructions, when completed, correctly stated the law, the jury was very well instructed and there is no cause for reversal of the case upon the instructions.

The trial court instructed the jury at moderate length and then the respective attorneys noted certain errors. The court then gave additional instructions which seemed to remove all of the defendant's objections to the instructions except one. The record then shows that a recess was taken for defendant's counsel to prepare a further instruction on one point. What happened during the recess this court will never know. After the recess, the court reconvened and the court inquired, "Do you have anything

further?" To this, counsel for the defendant replied, "We feel that we have nothing to offer." Therefore, while counsel subjectively may have had reservations about the instructions, yet, tested objectively, there is much validity to the proposition of plaintiff that the defendant consented to the instructions as given.

The judgment below is affirmed.