239 F.2d 257
 Arthur ROTH, as Administrator of the Estates of Alfredo Escoto, Albert Beadle and James Dean, Deceased, Appellant,
v.
David C. BIRD, Bessie B. Cox, and John G. Thompson, as Administrators of the Estate of Sid Cox, Deceased, et al., Appellees.
 No. 16177.
 United States Court of Appeals Fifth Circuit.
 December 26, 1956.
 
 Arthur Roth, Miami, Fla., for appellant.
 Douglas D. Batchelor, David W. Dyer, Smathers, Thompson & Dyer, Miami, Fla., for appellees.
 Before RIVES, TUTTLE and JONES, Circuit Judges.
 RIVES, Circuit Judge.
 
 
 1
 This appeal is taken from a judgment entered upon a directed verdict in favor of appellees in a consolidated negligence suit brought under the Jones Act[1] to recover for the death of three seamen, as a result of alleged negligent loading causing unseaworthiness of the M/V Wingate. The vessel was presumably lost at sea about December 22, 1949, while carrying a cargo of raw coffee on a voyage from Matanzas, Cuba to New Orleans, Louisiana. The errors most seriously urged, and hereafter considered seriatim, relate to the court's action (1) in refusing appellant's pre-trial motion for the production of the hull policy insuring the vessel; (2) in refusing to qualify appellant's witness, Richard Irving, to testify as an expert on the issue of whether negligent loading of the vessel proximately caused the loss; and (3) in directing a verdict for appellees for insufficiency of appellant's proof to make out a prima facie case of Jones Act liability.
 
 
 2
 We consider first the jurisdictional issue raised by appellees' motion to dismiss the appeal for failure to file the notice of appeal within the 30 days allowable under Rule 73(a), Federal Rules of Civil Procedure, 28 U.S.C.A., from the date of the court's entry of its orders denying a new trial. The record shows that appellant first filed motions for leave to appeal in forma pauperis on March 20, 1956, within 30 days after entry of the district court's orders denying such motions for new trial on February 24, 1956; and that orders denying such leave were filed by the court on April 19, such denial being predicated upon appellee's objection that the decedents were aliens with adequate funds whose representative was required to pay the costs of an appeal and could not claim pauper status within the meaning of 28 U.S. C.A. § 1915. Appellant promptly filed notices of appeal on April 19, the same date of entry of the court's orders denying the motions for leave to appeal in forma pauperis, but almost two months after entry of the orders denying their motions for a new trial; and thereafter proceeded timely with the appeal.
 
 
 3
 In Des Isles v. Evans, 5 Cir., 225 F.2d 235, 236, we held that the filing of a petition for leave to appeal in forma pauperis adequately met the requirements of Rule 73(a) as to the taking of an appeal. It would follow that the subsequent denial of leave to appeal in forma pauperis denied the privilege of not prepaying fees and costs, 28 U.S.C.A. § 1915, but that appellant still had the right promptly to proceed with his appeal as an ordinary appeal without such privilege. Differently construed, the rule would amount to a trap and a pitfall so deprecated in Des Isles v. Evans, supra. Tesciona v. United States, 9 Cir., 141 F.2d 811, 812, is distinguishable because of the failure there promptly to proceed with the appeal.
 
 
 4
 Appellant in brief insists that[2] the court improperly denied the motion to produce the hull insurance policy and reports pertaining to payments received thereunder on the theory that to require their production might permit injection of the prejudicial issue of insurance at the trial. We agree. Ordinarily the grant or denial of such motion is within the sound discretion of the trial court, subject to review only for abuse. See Carter v. Baltimore & O. R. Co., 80 U.S. App.D.C. 257, 152 F.2d 129. However, the last sentence of Rule 26(b), F.R. C.P., expressly provides: "It is not ground for objection that the testimony will be inadmissible at the trial if the testimony sought appears reasonably calculated to lead to the discovery of admissible evidence." The determinative pre-trial inquiry, therefore, is not whether a possibility of trial prejudice from requiring production of a document exists, an eventuality which it must be presumed the trial court will be alert to avoid, but whether its production will aid in the discovery of truth by revealing admissible evidence. The record reveals no other more likely and authoritative source of the information sought as to any previous hull survey of the vessel, and possible admission by appellees that the vessel sank, than might have been learned from an inspection of the hull policy and its connected reports, in spite of the court's unamplified, pre-trial comment that "there is a better way of getting it."[3] Under such circumstances, it seems to us that the district court, in denying the discovery sought, exercised its discretion improvidently and in reliance upon a wrong principle; and that, in so doing, it committed a fully reviewable error of law. See Commercial Credit Corp. v. Pepper, 5 Cir., 187 F.2d 71, 75; Whiteman v. Pitrie, 5 Cir., 220 F.2d 914, 919; Miller v. Tennessee Gas Transmission Company, 5 Cir., 220 F.2d 434, 436.
 
 
 5
 The error most seriously urged, however, and that which caused the court's direction of the verdict, was its refusal to permit the witness, Richard Irving, to testify as an expert witness concerning unseaworthiness of the Wingate caused by its negligent loading. Irving testified that he was a ship's master, holding "an unlimited master's license" from the United States Coast Guard, which permitted him to serve as master aboard any American vessel in any waters; that he had first gone to sea in 1929 as a cadet, and the next year entered the New York State School Ship from which he received his third mate's license in 1933; that he afterwards served as bosun, quartermaster, and able-bodied seaman on various vessels up until 1939, when he passed his Coast Guard examination and became a second mate; that he passed his examination for first mate in 1943, and his duties as a vessel's first officer included general supervision of all deck operations, as well as responsibility for proper loading of the vessel's cargo; that he received his master's license in 1947, which was renewed in San Francisco in August, 1953; that, while a cargo loading plan is generally presented by those ashore for the master's approval, and the first officer is initially responsible for safe loading and proper stowage, the master of the vessel has final responsibility to see that the loading plan suggested provides for proper stowage and distribution of weight, since these factors strongly affect the stability of a vessel; that on the larger vessels, upon which he had usually sailed, the general rule was to allocate not more than "two-thirds of the weight to the lower hold and one-third * `tweendecks", in order to avoid the possibility of the ship foundering. After objection by appellees' counsel that such testimony was too general, and a warning from the court that his testimony should relate more specifically to loading practice on vessels of the Wingate type, Irving further testified that the principles mentioned were applicable generally to the loading of all cargo vessels, including smaller cargo vessels, with only one hold and no " 'tweendecks", like the Wingate. Irving conceded, however, that he had never served as master aboard a small yacht converted to carry cargo, like the Wingate, though he stated his basic familiarity with their loading problems and that "there is no separation of ships with regard to the stability factor"; that, in fact, "there is a greater precaution necessary on those type of vessels." Upon the court's further intimation that it was still not satisfied with Irving's competency to testify as an expert on the loading of the Wingate, counsel for appellant requested the opportunity to make a record proffer of the remainder of Irving's testimony outside the presence of the jury, to which procedure the court acceded. In this final proffer, Irving testified that he had been aboard and was familiar with converted yachts, like the Wingate, and had made a previous inspection and survey of that type cargo vessel. Upon further questioning by the court, Irving conceded that he was not a qualified ship's architect, but stated that he had received extensive schooling in ship construction. He further testified that every ship has what is called a stability scale, or curve, issued by its builder upon completion, and that this stability curve cannot be safely ignored in loading any vessel. In response to further inquiry by the court, Irving admitted that this "stability curve" did vary to some degree with each ship; and that, to insure safe loading, such document should be consulted before any extensive loading above deck of such a yacht converted to carry cargo. Upon further questioning by counsel, however, Irving agreed that where, as in this instance, a vessel's dimensions and the nature, amount, and manner of loading its cargo were known, it was possible to ascertain with a reasonable degree of professional certainty whether the ship was improperly loaded, even without benefit of the stability chart or the ship blueprints which had been lost with the vessel.[4] Summarizing other proof as to the manner of loading the Wingate, which had previously been introduced through other witnesses, Irving further testified as follows:
 
 
 6
 "A. Your Honor, everything I got is from papers he has given me. I know what he has been asking me with relation to the dimensions. Now, actually, 495 130-lb. bags of coffee would total 64,350 lbs. of coffee on the main deck, above the main deck. That is only one point I want to bring out, which is important — 64,350 lbs., representing 495 bags of green coffee at 130 lbs. apiece. Now, that in itself represents 23.5 per cent of the cargo below the decks. There is 2105 bags of coffee below deck — if you can follow me — 2105 below and 495 above. Well, that coffee on the top deck represents 23.5 per cent of the coffee in the hold. Now, that in itself constitutes a danger, and I got textbooks to prove it, your Honor. It is a ship that is unstable. I wouldn't sail it out of the harbor, and I have been going to sea for 27 years.
 
 
 7
 * * * * * *
 
 
 8
 "Q. Where you have 23½ per cent of your cargo of green coffee above the deck, and some of it as high as seven feet, how would that affect the stability factor? A. Well, that raises the `g.m.' (center of gravity) * * * to a much higher degree than would ordinarily be allowable on a ship of that kind, regardless of what ship it would be. * * * Every time a curve of that kind is drawn to the scale it takes into consideration the contour of the vessel, and they know that it will not withstand the exerted pressure of a heavier roll, and naturally they consider it in the stability factors. So, therefore, when I say that this ship, in my own, — it is just my own opinion — and I just state this, that proportionately the ship was badly loaded and dangerously loaded.
 
 
 9
 "Q. What would that tend to do? A. It would cause a possibility of the vessel foundering, because when the ship starts to roll, roll over that way (indicating), the weight of the cargo that is on the higher side of the ship causes the vessel to become deader, and she rolls very slowly; she rolls so far over, the exertion of the center of buoyancy to raise that ship quickly is not there. Because of the raising of the center of gravity by the weights being high on the vessel, she rolls slowly. If the sea ever catches her — * * * the vessel is in serious danger of foundering right then and there, and so quickly that in a matter of minutes the ship could be lost, because of the stowage, the way that ship is stowed * * *."
 
 
 10
 Generally, a preliminary ruling upholding or rejecting the qualifications of a witness to testify as an expert is discretionary with the trial court. 20 Am.Jur., Evidence, § 786, p. 659; 32 C.J.S., Evidence, § 458b, p. 99. Indeed, Professor Wigmore states that the trial court exercises an almost unqualified discretion in this regard. II Wigmore on Evidence, 3rd ed., § 561, p. 641, et seq. Notwithstanding the court's broad discretion in such situation, however, we think its ruling is still reviewable where, as here, rejection of a witness' competency results from the application of an erroneous legal standard as to the nature and extent of the prior experience required to give such testimony probative value. Here, the court required Irving to show some previous experience, either in loading the Wingate or some vessel almost exactly like it, in order to express before the jury his opinion that negligent loading caused its loss, even though the witness several times stated that the same stability factors upon which he relied were applicable generally to vessels of the Wingate type. We think that ruling was too strict and unrealistic, and that all of appellees' objections went only to the weight, rather than the admissibility, of Irving's testimony, which was for the jury. This more liberal rule, we think, promotes the true purpose and ultimate function of all judicial inquiry, — the discovery of truth —, especially in cases like the present one where the loss of both vessel and crew makes more specific proof unavailable. As Judge Murrah, speaking for the Tenth Circuit in Bratt v. Western Air Lines, 155 F.2d 850, 854, so appropriately stated:
 
 
 11
 "It must be remembered that the court is not the judge of the quality of the evidence, nor does the witness perform the function of a juror — he can only contribute something to the jury's information and if he can, he should be permitted to do so. Especially is this true, where as here the answer to the crucial question is necessarily left to those claiming special knowledge based upon experience. If we close the door to testimony of this quality, in cases of this kind, we are brought to a point in the law of torts * * * where it would be impossible to prove a case except by the testimony of someone who actually experienced an accident of this kind, or who can base his opinion upon a scholastic background. We do not understand that such is, or should be, the policy of the law, and although we are most reluctant to disturb the ruling of the learned trial court, we are of the opinion that in determining the qualifications of the witness as an expert, it applied the wrong legal standards."
 
 
 12
 See also, Paradise Prairie Land Co. v. United States, 5 Cir., 212 F.2d 170, 173; Boise Payette Lumber Co. v. Larsen, 9 Cir., 214 F.2d 373, 378, 46 A.L.R.2d 1038; Hickey v. United States, 3 Cir., 208 F.2d 269, 278; and United States v. Wood, 4 Cir., 226 F.2d 924, 926.
 
 
 13
 Much of the above summarization of Irving's testimony and conclusion as to its admissibility is also referable to our consideration of the third and last error assigned, relating to the court's direction of the verdict for supposed insufficiency of the proof to justify jury submission on the issue of liability vel non. In view of the necessity of another trial, however, we might appropriately add that a full reading of the record has convinced us that appellant's testimony as a whole, and particularly that offered through the witness Irving, makes out, in the present state of the record, a jury case under the Jones Act. It being undisputed that the vessel and its crew had been missing since December, 1949, and the loss being otherwise unexplained, we think the jury could have inferred from all of appellant's testimony that its loss and the death of the decedents was due to unseaworthiness caused by its negligent loading at Matanzas. See Schulz v. Pennsylvania R. Co., 350 U.S. 523, 526, 76 S.Ct. 608.
 
 
 14
 The judgment is reversed and the cause remanded for further proceedings not inconsistent with the views herein expressed.
 
 
 15
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 Title 46, U.S.C.A. § 688
 
 
 [2]
 An initial specification of error not previously mentioned is the action of the district court in striking claims for unseaworthiness from the complaints, though appellant does not argue the point in brief. Appellees argue that the district court's action was proper because there is no cause of action for death from unseaworthiness under the general maritime law, citing Lindgren v. United States, 281 U.S. 38, 50 S.Ct. 207, 74 L. Ed. 686. If this point has not been abandoned, we think no reversible error in this respect is shown, for the record shows the court merely struck the claim of unseaworthiness per se, leaving in any unseaworthiness caused by negligence
 
 
 [3]
 Appellant was, of course, not confined to the possible source of information suggested by the appellees in their statement that the only survey they knew of was conducted by a Captain Richard Brown who lived at some address in Miami
 
 
 [4]
 In fact, Irving testified that it was even possible, with such data on the ship, and by the use of approved formulas, to prepare another stability curve scale