**PARADISE PRAIRIE LAND CO. et al.**

v.

**UNITED STATES.**

No. 14433.

United States Court of Appeals,
Fifth Circuit.

April 15, 1954.

E. F. P. Brigham, W. W. Colson, Jr., and Phillip Goldman, Miami, Fla., for appellants.

Roger P. Marquis, Elizabeth Dudley, Attys. Dept. of Justice, Washington, D. C., J. Edward Williams, Act. Asst. Atty. Gen., William D. Jones, Jr., Sp. Asst. Atty. Gen., Perpy W. Morton, Asst. Atty. Gen., for appellee.

Before STRUM and RIVES, Circuit Judges, and DAWKINS, District Judge.

STRUM, Circuit Judge.

This proceeding in eminent domain was instituted by the United States to acquire a large area of land in South Florida to be developed into Everglades National Park. Appellants, the owners of certain of said lands in Townships 59 and 60 South, Range 35 East, are complaining that the judgment below denied them just compensation.

The trial was held in two stages, the first to ascertain the map or plat by which the lands should be identified and measured; the second to determine value.

Appellants' title is deraigned from the Florida East Coast Railway Company, to which the land here in question, and a large area of other contiguous lands, were originally conveyed by the Trustees of the Internal Improvement Fund of the State of Florida [1] by deed, dated December 14, 1912. At that time very little of the land involved in this suit had been actually surveyed on the ground, although the south lines of Townships 58 and 60 South, Range 35 East, had been located on the ground by United States survey. The deed from the Trustees to the railway company recites that the State shall not survey, nor cause to be surveyed, nor pay for the surveying of, any of the lands not already surveyed by the United States, and that since the acreage is estimated, the Trustees shall not be liable for any deficiency, nor the railway liable for any excess.

On July 22, 1914, the Florida East Coast Railway Company, through its agent the Model Land Company, recorded a map, known as the Dooley map, covering the lands conveyed to the railway company by the Trustees of the Internal Improvement Fund, including the lands here in question. Since its recordation, this map has been used for identifying lands conveyed by the railway to its grantees, and to subsequent grantees including appellants, as well as for tax assessment purposes. This map, however, is also a compiled map, not based upon an actual survey. The Dooley map shows the sections in Township 59 and 60 South, Range 35 East, except the west tier, to actually contain 800 acres each, instead of the conventional 640 acres in a one-mile square section. The same sections also scale 800 acres to the section on the "official" map of the Trustees.

This was because the Trustees, in making their conveyance to the Florida East Coast Railway Company, did not use a plat based upon an actual survey, because none had then been made, but used an "official" map compiled by them, on which township, range and section lines had been projected to scale from points established by actual survey, including the south lines of Townships 58 and 60 South, Range 35 East. As the conveyance from the Trustees of the Internal Improvement Fund to Florida East Coast Railway Company, dated December 14, 1912, indicates that said grantee was to receive all lands in Range 35 East between the south line of Township 58 and the waters of Florida Bay, which is below the south line of Township 60, the Trustees conveyed to the railway many sections in Townships 59 and 60 which are shown by the Dooley map to contain 800 acres each, approximately 32 of which in Townships 59 and 60 have now passed by mesne conveyances into appellants, and are being taken in this proceeding.

In January, 1949, shortly before this suit was instituted, the United States, not through the General Land Office, but through the Land Acquisition Office of the National Parks Service, prepared its own map, known as the Base Map of the Everglades National Park. This map does not represent an actual survey on the ground, so far as appellants' lands are concerned, but is also a scale projection from known survey points, and compilations from other sources. This map created for the first time a "hiatus" township designated as Township 59½ South, Range 35 East, theretofore unknown, into which was thrown the surplus of approximately 160 acres to the section over conventional 640 acre sections.

The National Park Service induced the Trustees of the Internal Improvement Fund, on November 1, 1949, to adopt its map "as an official survey of the United States and of the State of Florida," and the Trustees ordered the same filed as such in the office of the Commissioner of Agriculture of Florida.

It is therefore of vital importance to determine which map should be used in

[1]. The Trustees of the Internal Improvement Fund is a state agency to which the United States on April 29, 1903, patented large areas of public lands in Florida to be used for state development purposes.

computing the acreage for which appellants are entitled to receive just compensation. The trial judge adopted the map prepared in 1949 by the Land Acquisition Office, known as the Base Map of Everglades National Park, as the "exclusive" map by which the land should be identified and measured, thus rejecting the Dooley and other maps.

The effect of this order, so far as appellants are concerned, is to eliminate 160 acres from each section (except the westerly tier of sections, and section 16), Township 59 South, Range 35 East, and from 2⅝ sections in Township 60, including 2.4 miles of road frontage in Township 59, being the lands owned by appellants. As appellants have no title to any lands in Township "59½," the adoption of the government map as the criterion of measurement substantially reduces the acreage for which appellants are entitled to just compensation.

There were actually 800 acres on the ground in the sections conveyed by the Trustees to the railway company by the deed dated December 14, 1912, except in the west tiers of some of the townships. The acreage remained thus for 37 years, from 1912 to 1949, when the Trustees adopted the government's newly compiled Base Map, showing for the first time 640 acre sections, thus depriving appellants of 160 acres to the section, in most of the area owned by them. There can be no serious dispute as to this, because the government's principal witness, Siler, admitted on the stand that the sections, with the exceptions stated, originally contained 800 acres on the ground, and that in compiling the government's Base Map, they threw surplus acreage into hiatus Township 59½, where necessary.

■ At least where, as here, an involuntary taking is involved, appellants are entitled, in the absence of an actual survey on the ground, to have their lands measured by the map or plat according to which they were conveyed to them, as that plat constructively becomes a part of the conveyance. If the sections conveyed to appellants actually contained 800 acres on the ground—a fact not seriously disputed—the United States can not, years later, by merely preparing another map and having it adopted by the Trustees, arbitrarily deprive appellants of a substantial portion of their property without just compensation, which is what has here occurred.

The Trustees conveyed to the railway company by the Trustees' own "official" map then in use, which was a mere projection—not an actual survey—and which as to the lands here under consideration scaled 800 acres to the section. Appellant, Paradise Prairie Land Company, acquired the lands from William W. Dewhurst, according to a plat "recorded in the Public Records of Dade County, Florida, in plat book No. 2, page 94." That is the Dooley map, which is also a projection, but which has been in use for 36 years as a basis for re-conveying the lands conveyed to the railway company by the Trustees by the deed dated December 14, 1912.

It would be both a denial of due process, and of just compensation, to now permit the Trustees, at the instance of the United States, to adopt a new map assembled by compilation—not by a survey on the ground, and of no greater dignity than the earlier maps so long in use—and employ it as a means of depriving appellants of a substantial part of their acreage. There is no objection to the Base Map prepared by the Land Acquisition Office becoming the official map of Everglades National Park, but for the purpose of awarding appellants compensation, the Dooley map should have been used as a basis for measuring their acreage. The finding to the contrary is clearly erroneous.

The problem in Hardee v. Horton, 90 Fla. 452, 108 So. 189, differs somewhat from the present problem. There, land had been conveyed by the Trustees according to the same "official" map as here, and the grantees had located their lines on the ground as best they could. Years later, an actual survey on the ground was made, which showed that the lines as originally located were errone-

ous, and should be changed. The property owners resisted, but were required to conform to the survey lines as located on the ground. That case, however, was merely a matter of the location of boundaries. It did not, as here, involve a deprivation of property by reducing the amount previously conveyed. If an actual survey of the lands here involved should disclose an inconsistency between what was conveyed and what was claimed on the ground by the grantee, it may be that the actual survey should prevail. But that question is not here presented.

It was said, however, in Hardee v. Horton, 90 Fla. 452, 108 So. 189, 199: "The mere fact that the map, known by the parties to represent no survey, was adopted by the trustees and designated and referred to in deeds executed by them as their official map, cannot bestow upon it evidentiary value which it does not possess. * * * The only method provided by law for an accurate identification of unsurveyed land, when described according to the rectangular method * * *, is *by a survey* according to the rules established by law. * * * " (Emphasis supplied.) See also Hall v. Florida State Drainage Land Co., 93 Fla. 1116, 113 So. 676; 11 C.J.S., Boundaries, § 24, p. 569.

On December 28, 1944, the Trustees of the Internal Improvement Fund conveyed all the lands then owned by them in the Park area to the United States, by deed No. 19035. Whatever may be the effect of that deed otherwise, it does not strengthen appellee's position as to the lands in controversy, because the Trustees had previously conveyed those lands to the railway company by the deed dated December 14, 1912. That deed conveyed all (except sections 16) of Townships 59 and 60, South, Range 35 East, which embraced the lands here in question. So, on December 28, 1944, the Trustees had nothing further to convey in Townships 59 and 60. The recital in the deed of December 14, 1912, that the Trustees shall not be liable for any deficiency, nor the grantee for any excess in acreage, was apparently regarded by the parties as of a substantial significance, as all parties understood they were dealing with unsurveyed lands.

At the preliminary trial to determine the proper map or plat to be used, appellants offered as an expert witness D. M. Duncan, who had surveyed for the State of Florida for more than 20 years and had had a total of 40 years experience in surveying in Florida, but was not licenced under Sec. 472.02, Fla.Stat.1951, requiring a licence to "practice" land surveying. Because of this, the trial judge refused to permit the witness to express an expert opinion as to the maps in controversy, although his qualifications appear to be otherwise sufficient.

 The trial judge is vested with a broad judicial discretion in admitting or rejecting expert testimony, but lack of a statutory licence to practice surveying is not of itself sufficient to justify the rejection of the testimony of one who is otherwise qualified as an expert.

An expert is one who qualifies as such by reason of special knowledge and experience, whether or not he is authorized to practice in his special field under a licencing requirement imposed by statute. The inquiry by the trial judge as to the qualifications of such a witness should be whether or not the witness possesses the special knowledge and experience to qualify him as an expert, not whether or not he has complied with the state's licencing requirements to practice that profession. Depfer v. Walker, 125 Fla. 189, 169 So. 660, 663; Lance v. Luzerne County etc., 366 Pa. 398, 77 A.2d 386, 389; Bratt v. Western Air Lines, 10 Cir., 155 F.2d 850, 166 A.L.R. 1061; Bowser v. Publicker Industries, D.C., 101 F. Supp. 386, 388. The witness should have been permitted to testify, if the only objection was lack of a statutory licence to practice surveying.

The Everglades Park Act, 16 U.S.C.A. §§ 410e–410h, authorizes the owners of lands taken for the Park to elect to retain certain oil, gas, and other mineral rights in the lands. By their original

and amended answer herein appellants elected to retain these rights. Thereafter, at the beginning of the valuation trial on April 21, 1952, appellants orally moved to amend their answer so as to relinquish these rights, and were permitted to do so.

On April 28, 1952, after the valuation trial had been in progress for eight days, appellants sought to again amend their answer by reinstating their reservation of mineral rights. This time the trial court refused to allow the amendment.

We are unwilling to hold the refusal an abuse of discretion, but in view of the liberal policy of the Rules of Civil Procedure, 28 U.S.C.A., as to amendments generally, and in view of the liberal attitude of Congress in the Everglades Park Act permitting the reservation of mineral rights, and since the case must be tried again for other reasons, we think no harm will be done by allowing appellants to again reserve their mineral rights, as the United States is establishing a public park—not embarking in the oil business.

Reversed and remanded.