Hiller Arthur HAYES, Appellant,

v.

UNITED STATES of America, Appellee.

No. 8834.

United States Court of Appeals
Tenth Circuit.

Oct. 19, 1966.

Robert W. Feiring, Kansas City, Kan., for appellant.

Benjamin E. Franklin, Asst. U. S. Atty., Kansas City, Kan. (Newell A. George, U. S. Atty., Kansas City, Kan., with him on the brief), for appellee.

Before PICKETT and HILL, Circuit Judges, and PAYNE, District Judge.

PAYNE, District Judge.

This is an appeal by Hiller Arthur Hayes from a conviction of second degree murder by a jury verdict and a sentence of life imprisonment, consecutive to the present imprisonment of the appellant. The conviction and sentence took place in the United States District Court for the District of Kansas.

The appellant contends that the lower court erred in five points which are set forth by the appellant in his brief as follows:

"1. The Court erred in overruling the motion of defendant Hayes to dismiss the indictment for lack of jurisdiction and, during the trial, taking judicial notice of, and instructing the jury, that the situs of the alleged crime was under the exclusive jurisdiction of the United States.

2. The Court erred in overruling the defendant's motion to suppress evidence, and during the trial, the admission of such evidence over the objection of defendant Hayes.

3. The Court erred in admitting as evidence a copy of a letter written by the defendant Hayes which was intercepted by prison officials as an administrative function of the prison.

4. The Court erred in permitting an unlicensed medical school resident to testify as to the results of an illegal and unlawful autopsy performed by such resident.

5. The Court erred in restricting defendant's proof of the vicious character of the deceased to those specific instances known personally by the defendant."

On May 20, 1965, a prisoner in the Leavenworth Penitentiary was found in

the basement of the laundry building. He had been stabbed several times and was immediately taken to the prison hospital where he was pronounced dead. The defendant Hayes was taken to the Warden's office, at which time his clothing was removed and he was examined by those present. A certain substance was scraped from the appellant's knees and from around his finger nails and from his shoes. The appellant was then given the usual clothes to be worn in segregation and was placed in solitary confinement.

For approximately one week before May 20, Aurelio Garcia Rombach had been in solitary confinement. At about ten a. m. on May 20, 1965, he was released and had been to the barber shop located in the laundry building at the penitentiary. There is a conflict as to the facts immediately surrounding the death of Rombach. The appellant Hayes admitted on the stand, however, that he stabbed him three times, the first time in the back, the second time in the left chest and the third time in the neck. The appellant claims that he acted in self-defense. There was other testimony that the decedent had been either stabbed or cut fourteen times.

The matter came on for trial on March 14, 1966, at Kansas City, Kansas, and the trial lasted through March 19, 1966, being 6 days of trial. The other matters of fact will be discussed in connection with the points raised as may be necessary.

Hayes was indicted with three other persons but a severance was granted as to two of the defendants, and the other defendant was tried with the defendant Hayes but was acquitted by the jury.

A motion to dismiss was filed on September 8, 1965, which raised a number of questions, all of which seem to have been abandoned except the challenge to the jurisdiction of the Court on the grounds that the Court was without jurisdiction of the subject matter of the offense, on the alleged proposition that the real property on which the prison is located is not under the sole and exclusive jurisdiction of the United States. This motion was overruled by the Court.

A motion to suppress every item taken from the defendant on May 20, 1965, and on other days thereafter, until August 26, 1965, was filed, on the grounds that said items were seized against the will of Hayes and without a search warrant. This motion was likewise denied. Other points were raised during the trial.

The Court will first discuss the question of jurisdiction raised by Point 1, above. There was no question but what the alleged incident took place in the laundry room of the penitentiary at Fort Leavenworth. The Court took judicial notice of the fact that the penitentiary was within the sole and exclusive jurisdiction of the Court.

The land upon which the penitentiary is situated was a part of the territory acquired by the United States from France in 1803, and as a result thereof the United States exercised jurisdiction over it until Kansas became a state. The original reservation was made by an Executive Order dated October 10, 1854, for military purposes. When Kansas was admitted as a state in 1860, the Federal Government did not reserve jurisdiction over Fort Leavenworth. On February 22, 1875, the Legislature of Kansas passed a statute entitled "An Act to Cede Jurisdiction to the United States over the Territory of Fort Leavenworth Military Reservation." This Act read as follows:

"Be it enacted by the Legislature of the State of Kansas:

Section 1. That exclusive jurisdiction be and the same is hereby ceded to the United States, and included within the limits of the United States Military reservation, in said state, as declared from time to time by the president of the United States, saving, however, to the said state the right to serve civil or criminal process within said reservation, in suits or prosecutions for or on account of rights acquired, obligations incurred, or crimes committed in said state, but outside of said cession and reserva-

tion; and saving further, to said state, the right to tax railroad, bridge and other corporations, their franchises and property, on said reservation.

Section 2. This act shall take effect and be in force from and after its publication once in the Kansas Weekly Commonwealth."

On June 10, 1896, Congress enacted a law (29 Stat. 380), which established a site for the erection of the penitentiary at Fort Leavenworth.

In 1927, the Legislature of Kansas passed an act, which reads as follows:

"27–101. Consent given to the United States to acquire land. That the consent of the State of Kansas is hereby given in accordance with the provisions of paragraph number seventeen, section eight, article one of the constitution of the United States, to the acquisition by the United States by purchase, condemnation or otherwise, of any land in the state of Kansas, which has been, or may hereafter be, acquired for custom houses, courthouses, post offices, national cemeteries, arsenals, or other public buildings, or for other purpose of the government of the United States.

27–102. Jurisdiction. That exclusive jurisdiction over and within any lands so acquired by the United States shall be, and the same is hereby, ceded to the United States, for all purposes; saving, however, to the state of Kansas the right to serve therein any civil or criminal process issued under the authority of the state, in any action on account of rights acquired, obligations incurred or crimes committed in said state, but outside the boundaries of such land; and saving further to said state the right to tax the property and franchises of any railroad, bridge or other corporations within the boundaries of such lands; but the jurisdiction hereby ceded shall not continue after the United States shall cease to own said lands.

27–104. Fort Leavenworth reservation. Laws 1875, chapter 66, section 1, included by reference."

The thrust of the argument of the appellant seems to be that the land in question was not acquired in accordance with the provisions of paragraph seventeen, section eight, article one, of the Constitution of the United States. Apparently, appellant also contends that any cession of land by the State of Kansas, in 1875, was for military purposes only, and that the use of the land for a penitentiary exceeded the authority granted by the statute in 1875, and that by reason thereof the United States did not have jurisdiction over that portion of the land used for a federal penitentiary.

It seems that when the Constitution was framed the delegates to the convention felt that the only way the Government might acquire property in the states was by purchase. That idea has not prevailed and it is now generally conceded that the United States may acquire property in other ways. However, when the Government does acquire property by purchase the consent of the state must be secured before the United States has complete jurisdiction over the property. Otherwise, the Government would be in the same position as any other proprietor. A complete discussion of this proposition is found in Fort Leavenworth Railroad Company v. Lowe, 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264. In this instance, the property was held and used by the United States for a military establishment before the state was created and the Government failed, for some reason, to reserve jurisdiction over the reservation. However, as previously stated, the State of Kansas ceded jurisdiction to the United States by an act of the Legislature in 1875. It is true that when this act was passed the entire property was held as a military reservation and such is recognized in the act of the Legislature. However, there is an implication in the act that the property might be used for railroads and by various corporations. There was no

provision in the law stating that it could not be used for some other purpose.

On June 10, 1896, the Government passed the statue, heretofore mentioned, setting aside a certain portion of the property in question for the penitentiary and put the same under the jurisdiction of the Attorney General of the United States. Evidently the appellant is taking the position that by this act the United States lost jurisdiction over the penitentiary for the reason the land was not being used for the purposes for which it was originally granted and that, by reason thereof, the prosecution in this case is void. The Court cannot read this implication into the acts mentioned.

Before 1896, some of the land was evidently used for farming and a tenant was convicted of a crime committed within the reservation but upon some of the land which was used for farming. Mr. Justice Brewer wrote the opinion for the Supreme Court of the United States in an appeal to that Court, in Benson v. United States, 146 U.S. 325, 13 S.Ct. 60, 36 L.Ed. 991. The Court had this to say about the situation:

"It is contended by appellant's counsel, that within the scope of those decisions, jurisdiction passed to the general government only over such portions of the reserve as are actually used for military purposes, and that the particular part of the reserve on which the crime charged was committed was used solely for farming purposes. But in matters of that kind the courts follow the action of the political department of the government. The entire tract had been legally reserved for military purposes. U. S. v. Stone, 2 Wall. 525, 537, 17 L.Ed. 765. The character and purposes of its occupation having been officially and legally established by that branch of the government which has control over such matters, it is not open to the courts, on a question of jurisdiction, to inquire what may be the actual uses to which any portion of the reserve is temporarily put. There was therefore jurisdiction in the circuit court, and the first contention of plaintiff in error must be overruled."

In the case of United States v. Unzeuta, 281 U.S. 138, 50 S.Ct. 284, 74 L.Ed. 761, there is a discussion of a crime committed on a right-of-way through a military reservation in the State of Nebraska. Mr. Chief Justice Hughes wrote the opinion of the Court and the Court took the position that the jurisdiction of the United States should be upheld. Although that is a different set of facts, it does cite with approval the case of Benson v. United States, supra. Other cases have been discussed in the briefs but we do not feel that they control in this case.

In 1927, the Kansas Legislature passed certain acts, heretofore quoted, which further confirmed and set at rest any question about the matter, since they referred to any land that had theretofore been acquired by the United States, and confirmed jurisdiction in the United States.

■ There is no question in the mind of the Court concerning jurisdiction in this case. While the place where the act was committed was not a military reservation, there is no question but what it was within the jurisdiction of the United States and that the State of Kansas had ceded exclusive jurisdiction to the United States except for limited purposes. This point is decided against the appellant.

The second point raised by the appellant was that a motion to suppress certain evidence had been filed by him and that during the trial objection was made to the introduction of this evidence and that the Court erred in its ruling in connection therewith. In substance, the appellant is contending that he was picked up by the officers of the penitentiary without any warrant of arrest and was thereafter detained in one of the offices at the penitentiary and his clothing was taken and certain scrapings from his body were taken without his

consent and were thereafter admitted in evidence in the trial of the case.

The appellant was not promptly taken before a Commissioner and charged with a crime. The appellant has further objected to the use of any evidence secured from the prisoner that he was not taken before a Commissioner promptly as required by Rule 5.

■ It is generally understood that a search and seizure may be made in connection with a lawful arrest and questions were asked during the course of the trial as to whether or not the prisoner had been arrested. In this particular case the prisoner was already in custody and, therefore, no further arrest was necessary. An arrest presumes taking the prisoner into custody and there could be no arrest of a prisoner who is already in custody.

■ The motion to suppress filed in this case was directed to suppressing the evidence and not to a release of the prisoner. Likewise, the objections during the trial seem to be along the same lines. The real question before the Court is whether or not there was an unreasonable search and seizure as prohibited under the Fourth Amendment to the Constitution. The theory of the appellant is that the goods were seized for use in a criminal case and not for the purpose of regulating or controlling the penitentiary and that such seizure was therefore illegal. The Constitution does not prohibit searches and seizures but prohibits unreasonable searches and seizures. This is brought out in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543.

In the motion to suppress and in the motion for new trial, no reference is made to Rule 5, in connection with any claim of delay. The motions were based solely on the contention that search and seizure of the clothes and other items of defendant was unreasonable. For that reason, we will confine this opinion to the questions raised in the motion to suppress and in the motion for a new trial with relation to the evidence, namely, that it was secured by an unreasonable search and seizure.

There was no question but what Rombach had been stabbed to death. The only question was whether or not there were reasonable grounds to believe that the appellant had killed him and that a felony had been committed. Correctional Officer Thomas J. Lamar had seen the appellant walking from the basement about the time in question, and Correctional Officer Kenneth W. Wooten had seen the appellant washing his hands in the basement of the laundry building just prior to the discovery of the decedent's body in that area. The appellant was escorted to the Warden's office. Blood could be seen on some of the articles of clothing and the clothing was thereupon confiscated. Also certain markings and bruises on the body of the appellant were noticed.

■ It appears to the Court that there were reasonable grounds for the search and seizure in question. It appears to us that if the appellant had not already been in custody there would have been reasonable grounds to arrest him and to make the search and seizure as an incident to the arrest. The fact that he was already in custody did not deprive the officers of the right to make the search and seizure. The question of search and seizure was discussed at length by the Supreme Court of the United States in Schmerber, petitioner, v. State of California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908. In that case the petitioner had been arrested at a hospital where he was being treated subsequent to an automobile accident. The police officer directed the physician to draw some blood from his body. An analysis of this blood was admitted in evidence at the trial. The Supreme Court took the position that the chemical analysis was admissible in evidence and that it was not the product of an unlawful search and seizure in violation of the Constitution. They also discussed the question of the privilege against self-incrimination and held that the facts in the case did not constitute com-

municative evidence and was not prohibited by the Constitution.

In this case the appellant was not required to speak or make any communication whatsoever. The only evidence seized was real evidence which was taken soon after the death of Rombach, and the Court holds that there were reasonable grounds for the search and seizure under the facts of this case.

The third point raised by the appellant was that the Court erred in admitting as evidence a copy of a letter written by the appellant, which letter was read by the prison officials and a copy thereof made. This letter was written by the appellant while in the solitary confinement portion of the prison and was addressed to a party in Denver. The original letter was lost and the copy was admitted in evidence. The objection of the appellant was on the ground that it was an invasion of privacy.

■ Counsel for the appellant admits that the case is governed by Stroud v. United States, 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103, and suggests that the Stroud case should be reversed, but it appears to this Court that the Stroud case is controlling. In any event, we cannot see that there was error in admitting this letter in evidence. It was voluntarily written and handled in the usual course of the administration of the penitentiary.

The fourth objection was to the ruling of the Court in permitting Dr. Paul Stanley Quinn to testify. He was the person who performed the autopsy on the body of the decedent Rombach. He received a B.S. degree from the University of Illinois in 1954, and a Doctor of Veterinarian Medicine in 1956. He received his M.D. degree from the University of Iowa in 1961. He had performed approximately one hundred and fifty autopsies prior to the time he performed the autopsy on the body of Rombach. He was licensed to practice in the State of Missouri, and had passed an examination which would entitle him

to acquire a license in forty-six states in the Union, of which Kansas was one. Section 19–1033 of the Kansas Statutes reads, in part, as follows:

"If, in the opinion of the coroner * * * an autopsy be made * * * such autopsy shall be made by the coroner or by such competent pathologist or other licensed physician as may be designated by the coroner for the purpose."

It is the contention of the appellant that Dr. Quinn does not meet the qualifications set up by the statute, and that since he is not licensed to practice medicine in the State of Kansas, that his testimony should not have been admitted.

It appears to the Court that Dr. Quinn was well qualified as an expert, and whether or not he was licensed in the State of Kansas did not control in this case. We need not enter into a discussion of that phase of the objection.

■ It is well settled that medical experts may be permitted to testify in matters concerning which they are qualified even though they may not be licensed to practice medicine in the jurisdiction involved. 32 C.J.S. Evidence § 546(92) pages 336–346.

■ We do not pass on the question of whether or not Dr. Quinn falls within the provision of the statute. In any event, we feel that he is an expert whose testimony was admissible at the trial. See United States of America, plaintiff, v. 60.14 acres of land, etc., 235 F.Supp. 401, Paradise Prairie Land Company v. United States, 5th Cir., 212 F.2d 170, and Bratt v. Western Airlines, 10 Cir., 155 F.2d 850.

Dr. Quinn was well qualified by both training and experience to give expert testimony in the matter of autopsies, and the Court did not err in admitting his testimony.

The fifth and final point raised by the appellant was that the Court committed error in restricting the proof of appellant with regard to the vicious character of the decedent to those specific

instances known personally by the defendant.

To begin with, the Court can't concur that the trial court did restrict the defendant's proof to specific instances known personally by the defendant. The defendant testified personally that he had been told of the general reputation in the penitentiary of the decedent, to the effect that the decedent was "pretty tough with a knife." Also he understood that the reputation of the decedent in the penitentiary was that he was "knife happy." The defendant also knew that the decedent was serving a sentence for stabbing an inmate at La Tuna. This was testified to by the defendant. The defendant also testified that one of the custodial officers had called the deceased prisoner "old butcher Rombach," and had told him that Rombach had poured hot coffee on an inmate when Rombach was in the penitentiary before. The officer also told him that a knife had been found in Rombach's cell and that Rombach was "undressed without a knife." There was other testimony about the reputation of Rombach and the Court permitted introduction of testimony concerning the conduct of Rombach while in the Leavenworth Penitentiary and let testimony in concerning his general reputation. This covered matters within the knowledge of the defendant and the records of the penitentiary relative to the decedent.

The lower court did restrict the testimony to some extent. He held that specific acts of conduct which were remote in time and not known by the defendant Hayes were not admissible.

■ This seems to be the general holding of the majority of the courts. There is no question but what the defendant in a homicide case may introduce evidence of the "turbulent and dangerous character of the deceased." See 64 A.L.R. 1029.

■ However, the general rule is that evidence of specific conduct on the part of a decedent that has to do with assaults on people other than the defendant, and not known to the defendant, are not admissible. The general rule is that the general reputation of a decedent may be shown, but that specific acts against other persons than the defendant, which are remote in point of time, are not admissible when they are not known by the defendant. There is no question in this case that the offer of proof was concerning acts committed elsewhere than at the Leavenworth Penitentiary, and that they were remote in time and not connected with the matters on trial, and that they were not connected with the defendant. It is also understood that the defendant had no personal knowledge of these acts. Under such circumstances the ruling was correct. 121 A.L.R. 380.

The Court could discuss this at some length but it would unduly lengthen this opinion. Suffice it to say that the Court has carefully read the record and the briefs of the parties, and the Court holds that the rulings of the lower court in this respect do not constitute error.

In this case it is clear that the decedent and the defendant were involved in an altercation of some kind which ended up in the death of Rombach. A plea of self-defense was entered. The appellant claims that the decedent struck at him with a knife and that it was only then that he acted in self-defense. He does not claim that he acted by reason of some fear of the decedent, which arose previous to the time when the decedent swung at him with the knife. His claim of self-defense was hinged entirely on his assertion that he only acted in self-defense after the decedent attempted to strike him and cut him with the knife. He cannot now claim that it was something which happened some years before, which caused him to act in self-defense.

It is true there are cases where the courts have admitted testimony for what bearing it may have on the question of who was the aggressor. The general rule is that if the act is part of the res gestae, or if it is not remote in time, it may have some bearing on the ques-

tion. In this case the Court permitted the defendant to show all of the acts of the decedent while he was in the penitentiary at Fort Leavenworth and permitted the parties to thoroughly set forth the character and reputation of the decedent in Fort Leavenworth. Anything further than that would be irrelevant in this case.

The lower court and this Court have both read Evans v. United States, 107 U.S.App.D.C. 324, 277 F.2d 354, 1 A.L.R.3d 566. That case stands for the proposition that a defendant may show the character and belligerency of a decedent for what bearing it may have in proving who was the aggressor even though it was unknown to the defendant. In this case the character, reputation and belligerency of the decedent were all set forth at length in the evidence. No restriction was made in this regard. His bad reputation was shown and his conduct, which was not remote in time, was testified to. For all of the foregoing reasons this point is ruled against the appellant.

Affirmed.